**UNITED STATES, Appellee**

v.

**Patrick R. ARGO, Second Lieutenant U.S. Air Force, Appellant.**

No. 96–0101.
Crim.App. No. 30830.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 7, 1997.

Decided Aug. 25, 1997

For Appellant: *Major Robin S. Wink* (argued); *Colonel David W. Madsen* (on brief); *Colonel Jay L. Cohen, Lieutenant Colonel Kim L. Sheffield,* and *Captain Mark J. Simms.*

For Appellee: *Major LeEllen Coacher* (argued); *Colonel Theodore J. Fink* and *Lieutenant Colonel Michael J. Breslin* (on brief); *Colonel Jeffery T. Infelise.*

---

*Opinion of the Court*

GIERKE, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of willfully disobeying his superior commissioned officer (3 specifications) and adultery, in violation of Articles 90 and 134, Uniform Code of Military Justice, 10 USC §§ 890 and 934, respectively. The adjudged and approved sentence provides for dismissal, confinement for 2 months, and total forfeitures. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

We granted review of the following issues:

I

WHETHER APPELLANT'S CONVICTION OF ALL CHARGES AND SPECI-

FICATIONS SHOULD BE SET ASIDE AND ALL CHARGES AND SPECIFICATIONS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE OF PROSECUTORIAL MISCONDUCT BY THE SPECIAL COURT–MARTIAL CONVENING AUTHORITY'S STAFF JUDGE ADVOCATE.

## II

WHETHER APPELLANT'S CONVICTION OF ALL CHARGES AND SPECIFICATIONS SHOULD BE DISMISSED WITH PREJUDICE BECAUSE OF PERVASIVE COMMAND INFLUENCE BY THE SPECIAL COURT–MARTIAL CONVENING AUTHORITY'S STAFF JUDGE ADVOCATE.

The allegations of prosecutorial misconduct and unlawful command influence are based on the actions of Major (Maj) Bloom, the staff judge advocate (SJA) for the special court-martial convening authority who forwarded the charges and recommended trial by general court-martial. The same acts are alleged to be both prosecutorial misconduct and unlawful command influence.

Appellant alleges that Maj Bloom had improper, *ex parte* contact with the Article 32, UCMJ, 10 USC § 832, investigating officer; attempted to influence the testimony of his subordinates at the Article 32 investigation; improperly coached Lieutenant Colonel (LtCol) Gilbert, the officer whose orders were allegedly disobeyed, before LtCol Gilbert testified at the Article 32 investigation; and failed to disclose a letter of reprimand that the defense could have used to impeach a government witness at the Article 32 investigation. Appellant also contends that he was singled out for vindictive and disparate treatment. Finally, he contends that Maj Bloom violated Air Force regulations by detailing one of his subordinates to represent Second Lieutenant (2Lt) D, the husband of the woman with whom appellant had an adulterous relationship.

### Factual Background

The offenses arose while appellant was assigned to the 54th Flying Training Squadron at Reese Air Force Base (AFB), Texas, for flight training. On October 16, 1992, LtCol Gilbert, appellant's squadron commander, was informed that appellant was involved in an adulterous affair with the wife of another officer, 2Lt D. Appellant and 2Lt D were assigned to the same flight in LtCol Gilbert's squadron. LtCol Gilbert ordered appellant "to avoid all personal and social contact with 2Lt [D]" until completion of his investigation of the adultery allegation. He also ordered appellant "to avoid all contact with" Mrs. D. Finally, he instructed appellant: "In the event you need to coordinate matters related to this investigation, you will arrange contact with Mrs. [D] through your Area Defense Counsel or myself."

On October 26, LtCol Gilbert offered appellant nonjudicial punishment under Article 15, UCMJ, 10 USC § 815, for adultery, but he later withdrew the offer when he received reports that appellant had violated the "no-contact" order by continuing to visit Mrs. D. On November 18, 1992, LtCol Gilbert preferred charges against appellant for both adultery and willful disobedience of his order. Maj Bloom, the wing commander's SJA, swore LtCol Gilbert to the charges and also received them on behalf of the wing commander. On November 19, Captain (Capt) Feliciani, a member of the SJA's office at Sheppard AFB, Texas, was appointed to conduct an Article 32 investigation of the charges. Although she was assigned to Sheppard AFB, she was appointed by the Commander, 64th Flying Training Wing, at Reese AFB. The order appointing Capt Feliciani was signed by Maj Bloom for the wing commander.

Appellant's case arose in an atmosphere of conflict and suspicion between Maj Bloom and the area defense counsel, Capt Jackson. Maj Bloom suspected that Capt Jackson was obtaining information from his office without proper clearance. Maj Bloom testified that at about the same time as the Article 32 investigation of appellant's case, he held an office meeting where he told his staff that "Captain Jackson's interests were not unitary with those of the Government and that we needed to be more careful in what infor-

mation got out of this office until it was appropriate to release it."

Capt Knapp and Capt Welsh, Maj Bloom's two subordinate officers, remembered Maj Bloom's admonition in somewhat stronger terms—that Maj Bloom threatened nonjudicial punishment for any further office "leaks." Maj Bloom testified that he had no specific recollection of mentioning nonjudicial punishment but that it was possible.

At trial, appellant moved to dismiss the disobedience charges as overly broad and violative of the First Amendment and to dismiss all the charges due to unlawful command influence and selective prosecution. He challenged the wording of the disobedience specifications and moved for a bill of particulars. He moved to disqualify assistant trial counsel (Capt Welsh) and challenged the selection of court members. He challenged the validity of the SJA's pretrial advice submitted by Col Matthewson, SJA to the general court-martial convening authority. He moved to disqualify Maj Bloom from acting as SJA to the special court-martial convening authority. Even though most of the accusations of misconduct against Maj Bloom pertain to the Article 32 investigation, appellant did not ask for a new investigation.

### Standard of Review

On issues of prosecutorial misconduct, we review the military judge's findings of fact under the "clearly-erroneous" standard. The questions whether the facts found by the military judge constitute prosecutorial misconduct and whether such misconduct was prejudicial error are questions of law that we review *de novo*. *See United States v. Meek*, 44 MJ 1, 5–6 (1996); *United States v. Sullivan*, 42 MJ 360, 363 (1995). Prosecutorial misconduct is "action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." If there is prosecutorial misconduct, we review "the trial record as a whole to determine whether such a right's violation was harmless under all the facts of a particular case." *Meek, supra* at 5.

On issues of command influence, we review the military judge's findings of fact under a clearly-erroneous standard, but we review *de novo* "the question of command influence flowing from those facts." *United States v. Wallace*, 39 MJ 284, 286 (CMA 1994). "The defense has the initial burden of producing sufficient evidence to raise unlawful command influence." *United States v. Ayala*, 43 MJ 296, 299 (1995). Once the issue is raised, "the appearance or existence of unlawful command influence creates a rebuttable presumption of prejudice." *United States v. Wallace, supra.* In cases where unlawful command influence has been exercised, we will not affirm the decision below on the findings and sentence unless we are "persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *United States v. Thomas*, 22 MJ 388, 394 (CMA 1986).

### Improper Contact with Investigating Officer

The Article 32 Investigating Officer, Capt Feliciani, testified at trial that Maj Bloom visited with her several times while she was preparing her report and that he suggested legal authorities supporting the lawfulness of LtCol Gilbert's order. Maj Bloom asked for and received copies of the summarized testimony. According to Capt Feliciani, Maj Bloom "was concerned about the … 'flavor' of Captain Knapp's testimony." She also testified that Maj Bloom told her that he thought defense counsel was "trying to push … [her] around." Capt Feliciani testified that she felt that Maj Bloom "was trying to influence" her, but she testified that she could not "point to anything overtly or specifically that he did." She testified that Maj Bloom's apparent attempts to influence her were unsuccessful. Because she was uncomfortable with Maj Bloom's frequent visits, she returned to Sheppard AFB to complete her report instead of completing it while at Reese AFB.

Capt Feliciani testified at trial that Maj Bloom asked her to reopen the investigation to explore the issue of unlawful command influence. She responded that she did not think it was necessary, but after consulting

with her superior, the SJA at Sheppard AFB, she reopened the investigation over defense objection.

Maj Bloom testified at trial that he approached Capt Feliciani as she was typing summaries of the testimony and "stopped by merely as a friendly gesture, 'How are things going? What can we get for you?'" He testified that Capt Feliciani indicated the defense was raising unlawful command influence and that he became concerned. He told her that "this may be a reason to reopen the 32 testimony," and he asked for copies of the testimony so that he could "see what basis there might be for any allegations of command influence." Maj Bloom admitted that he told Capt Feliciani that "the defense was trying to push her around" after Capt Feliciani told him that defense counsel was opposed to reopening the investigation. Maj Bloom testified that he "suggested that she talk to somebody at Sheppard" before deciding whether to reopen the investigation.

At trial Maj Bloom denied attempting to influence Capt Feliciani. He testified that his intent in requesting that the investigation be reopened was to ensure that all issues were addressed. Regarding the validity of the order, he testified that he gave Capt Feliciani a copy of *United States v. Wine*, 28 MJ 688 (AFCMR 1989), cited by the defense in support of their argument that the "no-contact" order was invalid. Maj Bloom believed that *Wine* actually supported the government position more than it supported the defense. He testified, "I asked her to take an outside unbiased look at that case and the facts of the case to see if there was something that I was missing in my evaluation of the case."

The military judge found that Maj Bloom's request that the Article 32 investigation be reopened to explore the issue of command influence was "not improper nor improperly motivated." The military judge made no specific findings concerning Maj Bloom's conversations with the investigating officer about the legality of the "no-contact" order.

There are two aspects of Maj Bloom's contact with the investigating officer: (1) his request that the investigation be reopened to investigate the issue of unlawful command influence; and (2) his efforts to convince the investigating officer that the defense argument regarding the legality of the "no-contact" order was not supported by the *Wine* decision.

▇▇▇ Regarding the first aspect, we hold that Maj Bloom did not act improperly by requesting the investigating officer to reopen the investigation. Although Capt Feliciani was assigned to Sheppard AFB, she was appointed to conduct the investigation by the Commander, 64th Flying Training Wing at Reese AFB. Maj Bloom was the wing commander's SJA. "A staff judge advocate generally acts with the mantle of command authority." *United States v. Kitts*, 23 MJ 105, 108 (CMA 1986).

In this case Maj Bloom had taken several official actions on behalf of the wing commander: receiving the sworn charges and signing the order appointing Capt Feliciani. Because it would have been proper for the wing commander himself to direct Capt Feliciani to investigate the issue of unlawful command influence, there was nothing facially improper in his representative, Maj Bloom, requesting that the investigation be reopened. There is no evidence that Maj Bloom was acting beyond the scope of his authority as the wing commander's representative. Accordingly, in the absence of evidence that Maj Bloom was acting outside the scope of his authority, we hold that it was not improper for Maj Bloom to request that the investigation be reopened.

Assuming, *arguendo*, that Maj Bloom's request was in some way improper, appellant still would not be entitled to relief. On the record before us, we cannot discern how appellant could have been prejudiced by a full investigation of his allegations of unlawful command influence.

▇▇▇ The second aspect is more troublesome. An "Article 32 investigation is a judicial proceeding." *United States v. Bell*, 44 MJ 403, 406 (1996). *Ex parte* communications between an Article 32 investigating officer and a member of the prosecution are improper. *United States v. Payne*, 3 MJ 354 (CMA 1977). The legal advisor to the inves-

tigating officer should be neutral. *Id.* at 356. An SJA is not a prosecutor and is usually in a position to give neutral advice. *See* Art. 6(c), UCMJ, 10 USC § 806(c) (acting as prosecutor or defense counsel disqualifies officer from acting as SJA); *see generally United States v. Lynch*, 39 MJ 223 (CMA 1994), and *United States v. Engle*, 1 MJ 387 (CMA 1976) (discussing duty of SJA to give unbiased advice). The record in this case reflects, however, that Maj Bloom was acting as an advocate for the Government, trying to convince Capt Feliciani that the defense's interpretation of the *Wine* case was incorrect and that the "no-contact" order was legal. We hold that such *ex parte* advocacy was improper. *United States v. Payne, supra.*

■ Testing for prejudice, however, we find none. Capt Feliciani resisted Maj Bloom's advocacy, sought independent advice from her SJA at the next higher level of command, and exercised her independent judgment. To the extent that Maj Bloom engaged in improper *ex parte* advocacy and that his acts may have constituted an attempt at unlawful command influence, we are satisfied from the evidence of record that his efforts failed. We note that the defense did not ask the appointing authority to appoint a new investigating officer or ask the military judge to order a new Article 32 investigation. *See* RCM 405(j)(4), Manual for Courts–Martial, United States (1995 ed.) (objections to report must be made to appointing authority within 5 days after receipt of report), and RCM 905(b)(1) (motions or objections based on defective investigation must be made before pleas). While we do not condone Maj Bloom's conduct, we hold that appellant was not prejudiced by Maj Bloom's improper *ex parte* contacts with the Article 32 investigating officer.

### Attempts to Influence Subordinate's Testimony

■ Capt Knapp, a member of Maj Bloom's office, testified at trial that he, Maj Bloom, and Capt Welsh had "a number of conversations" before the Article 32 investigation regarding the lawfulness of LtCol Gil-

bert's order. Capt Knapp described the conversations as follows:

> During these conversations—and all of them were initiated by Major Bloom, he would discuss things such as, "You know, it's too bad that no one in this office is able to say that we reviewed the order given to Argo before it was issued. You know, it would cast a more favorable light upon the office if we were able to tie the order to flight safety. It would cast a more favorable light upon the office or put a more favorable spin upon the order if, you know, we could tie these things actually into the order." And, of course, this is all after the fact. It wasn't done before.

Notwithstanding Maj Bloom's comments on how the legal posture of the case could have been made better, Capt Knapp testified at trial that he felt "free to testify [at the Article 32 investigation] in any manner that I chose to." He testified that the investigating officer "focused a lot of attention upon whether or not these conversations that took place between Major Bloom, myself, and Captain Welsh with regard to the Argo order were intended or designed to influence either my testimony or Capt Welsh's testimony if he were to testify at the Article 32." Capt Knapp testified at the Article 32 investigation that he did not believe Maj Bloom "was trying to influence" his testimony.

Capt Knapp testified that Maj Bloom called him after he first testified at the Article 32 investigation and questioned him about his testimony. Capt Knapp was surprised and "a little concerned" about the call, but he gave Maj Bloom the benefit of the doubt and did not think at that time that Maj Bloom had done anything improper.

After the Article 32 investigation, Capt Knapp changed his opinion about Maj Bloom's motives, based on two events. The first was a "performance feedback session" during which Maj Bloom told him that he was the "best attorney I have" but that he had a problem with listening. Capt Knapp testified that Maj Bloom told him, "You knew there were areas and issues that you were not to address in your Article 32 testimony." The second event was Capt Knapp's review

of LtCol Gilbert's Article 32 testimony, where he concluded that LtCol Gilbert said exactly the same things as Maj Bloom. Capt Knapp told Capt Welsh that LtCol Gilbert's testimony was "too technical" and "too legal for a non-lawyer." Capt Knapp's impression that LtCol Gilbert had been coached was reinforced by the fact that "immediately prior to his testimony, he spent at least an hour behind closed doors with Major Bloom in Major Bloom's office."

Capt Knapp testified at trial that he told Maj Bloom, "There are things, you know, that occurred in this case, there are discussions that we've had, and my concern is it appears you're trying to influence testimony." He testified that Maj Bloom responded, "Well, do you really think I was trying to do that[?]" and that Capt Knapp said, "It looks like it." Capt Knapp testified that, after the Article 32 investigation was completed, Maj Bloom told him, "If there's been a problem or maybe I've overstepped my bounds, I'll take the hit. Don't worry."

Capt Welsh did not testify at the Article 32 investigation. He testified at trial that he did not feel that Maj Bloom was trying to influence testimony and that he felt no pressure from Maj Bloom regarding his testimony. Capt Welsh testified that Maj Bloom is a "very intimidating person" because he is "a big guy and . . . hard to read."

Maj Bloom testified at trial that he discussed the basis for the validity of the order with Capt Knapp and Capt Welsh before the Article 32 investigation. He testified that he anticipated that they would be asked their opinion on the validity of the order and that he had a "responsibility to set forth what the legal opinion and policy of this office is." Maj Bloom believed that neither Capt Knapp or Capt Welsh had any factual knowledge regarding the offenses and that they were being called to testify as to their legal opinions regarding the order. After reading the summary of Capt Knapp's Article 32 testimony, Maj Bloom thought it necessary to find out "his actual thoughts and perceptions." He called Capt Knapp and asked him to clarify his statement and asked him if he perceived that he was being asked to "change

the factual basis of his testimony as opposed to being an instruction on the legal theory of the case," and Capt Knapp said, "No."

On cross-examination, Maj Bloom was asked if during Capt Knapp's "performance feedback" session he discussed Capt Knapp's Article 32 investigation testimony. Maj Bloom responded, "I don't think so, not specifically." Defense counsel then asked Maj Bloom if he told Capt Knapp, "I told you there were certain things you weren't supposed to testify to at the Article 32 and you just didn't listen to what I had to say." Maj Bloom responded, "[T]hat statement is absolutely false."

The military judge found that, before the Article 32 investigation began, "the three attorneys in the Reese legal office [Maj Bloom, Capt Knapp, and Capt Welsh] had numerous informal open-door discussions with each other about the legality of the order and the progression of the case." Capt Knapp was "uncomfortable" with Maj Bloom's comments before the Article 32 investigation, but Capt Knapp did not believe at that time that Maj Bloom was attempting to influence his testimony. The military judge further found that, after Capt Knapp reflected back on his performance review, he "felt like Major Bloom was in some way attempting to influence his testimony." The military judge found that Capt Welsh was present during the same conversations and did not perceive any attempt to influence his testimony. The military judge concluded that "the evidence of record clearly supports" Maj Bloom's denial that he attempted to influence the testimony of Capt Knapp and Capt Welsh.

Initially, we do find it unusual that Capt Knapp was called to testify under oath about his legal opinion instead of the facts of the case, because an Article 32 investigation is fundamentally a factfinding hearing. *See* RCM 405(a), Discussion (function of Article 32 investigation "is to ascertain and impartially weigh all available facts"), and RCM 405(e), Discussion (investigating officer "not required to rule" on legal issues). This issue would not be before us if the investigating officer had sought legal advice on the validity

of the "no-contact" order from the SJA's office at Sheppard AFB, instead of eliciting legal opinions, in the form of sworn testimony, from a subordinate member of the legal office at Reese AFB, with whom LtCol Gilbert consulted regarding the validity of the order.

Because of the unusual nature of the Article 32 testimony in this case, we are faced with an unusual question regarding the discussions between Maj Bloom and the subordinate lawyers in his office. Had he attempted to influence their testimony regarding factual matters, his conduct clearly would have been improper. However, we do not consider it improper or even unusual for an SJA to discuss legal issues in pending cases with his subordinate lawyers. We likewise see nothing improper in an SJA's desire to ensure that his office speaks with one voice and that his subordinates not give legal advice contrary to his views while purporting to speak for him.

Maj Bloom was properly concerned that an issue of unlawful command influence could arise if Capt Knapp perceived that Maj Bloom was trying to influence his testimony. Unfortunately, Maj Bloom's ill-advised telephone call after Capt Knapp testified reinforced rather than minimized that perception. Nevertheless, we hold that the military judge did not err by ruling that Capt Knapp's Article 32 testimony was not affected by unlawful command influence, especially in light of Capt Knapp's testimony that he did not perceive any pressure until after he had testified and in light of the fact that the testimony at issue was a legal opinion rather than testimony about factual matters.

### Improper Coaching of LtCol Gilbert

 Regarding his conference with LtCol Gilbert before the Article 32 investigation, Maj Bloom specifically denied telling LtCol Gilbert how to testify. Maj Bloom described the meeting as one involving "drinking coffee and just chatting about things in general." Maj Bloom testified that, during this meeting, he and LtCol Gilbert discussed whether the advice LtCol Gilbert had received on the

"no-contact" order was protected by the attorney-client privilege.

LtCol Gilbert testified that, during his meeting with Maj Bloom, they "discussed what happens at a 32 and who all the people here were." He also testified that those were not the only subjects discussed, but he was not asked and did not say what else he and Maj Bloom discussed. The military judge found that Maj Bloom's visit with LtCol Gilbert shortly before the Article 32 investigation was "not improper nor improperly motivated."

In *United States v. Stombaugh*, 40 MJ 208, 213 (1994), we said, "Whether the allegation is one of unlawful command influence or unlawful interference with access to a witness, the burden of production is on the party raising the issue." While "the threshold triggering further inquiry should be low ... it must be more than a bare allegation or mere speculation." *Id.*, quoting *United States v. Johnston*, 39 MJ 242, 244 (CMA 1994). If Maj Bloom had attempted to influence LtCol Gilbert's testimony, either as a command representative or in his individual capacity, such conduct would violate Article 37, UCMJ, 10 USC § 837. *See United States v. Stombaugh, supra.*

As a general proposition, it is not improper for a commander and an SJA to discuss the legal issues in a pending case. It may have been unwise, in light of the atmosphere of hostility and suspicion surrounding appellant's case, for Maj Bloom and LtCol Gilbert to confer privately shortly before LtCol Gilbert testified at the Article 32 investigation. Nevertheless, on the record before us, there is no evidence to support Capt Knapp's speculation that Maj Bloom improperly influenced LtCol Gilbert's testimony at the Article 32 investigation.

We see two obvious explanations for Capt Knapp's observation that Capt Feliciani's summary of LtCol Gilbert's testimony contained language that was "too technical" and "too legal for a non-lawyer." First, LtCol Gilbert testified that he consulted several times with Maj Bloom and his subordinate lawyers about the three adultery cases, all of which included "no-contact" orders. Accord-

ingly, he should have been familiar with the legal justification for such an order. Second, the summarization of LtCol Gilbert's testimony was prepared by a lawyer, Capt Feliciani, who could reasonably be expected to couch his testimony in precise, legal terms.

On the record before us, there is no evidence that Maj Bloom influenced or attempted to influence LtCol Gilbert's testimony. In the absence of evidence to support Capt Knapp's speculation, we hold that appellant has not met his burden of raising the issue.

*Failure to Disclose Impeachment Evidence*

■ Appellant asserts that the Government failed to disclose a letter of reprimand received by 2Lt D for adultery. Appellant argues that the letter was impeachment evidence of a key government witness and should have been released. He asserts that the letter of reprimand was "known to the Staff Judge Advocate and his subordinate lawyers." Final Brief at 19.

The Article 32 Report of Investigation does not contain a defense request for discovery that would encompass the letter of reprimand. Capt Feliciani, the investigating officer, testified at trial that she remembered defense counsel asking 2Lt D if he had engaged in an adulterous relationship, and she remembered 2Lt D responding, "No." Capt Feliciani testified that she remembered the question and answer because she thought to herself, "Two wrongs don't make a right," and she did not understand why defense counsel was asking the question. She did not consider the matter to be significant enough to warrant including it in her summary of 2Lt D's testimony.

At trial, 2Lt D testified that he received a letter of reprimand for adultery on December 10 and that he testified at appellant's Article 32 investigation on December 15. He did not mention his letter of reprimand to anyone on the defense team before the Article 32 investigation. When defense counsel asked 2Lt D at trial if he "recall[ed] testifying that ... [he] did not have an adulterous affair," 2Lt D responded, "You didn't ask me that question." Even after being told that the investigating officer and a defense coun-

sel remembered the question, 2Lt D insisted that no one asked him the question. On cross-examination, 2Lt D testified that he expected the question to be asked at the Article 32 investigation and he was surprised when the defense did not ask it.

Defense counsel requested and received a copy of the letter of reprimand after the Article 32 investigation and before trial. The military judge made no specific findings concerning the alleged failure to disclose the letter of reprimand before the Article 32 investigation.

Although the record reflects that 2Lt D received his letter of reprimand 5 days before the Article 32 investigation began, the record does not reflect when his opportunity for rebuttal expired, when the letter was placed in his personnel files, or when the SJA learned that the process had been completed. We need not consider these factual issues, however, because any defect in the Article 32 investigation based on nondisclosure of evidence was not raised in an objection to the report of investigation under RCM 405(j)(4) or at trial in a motion for appropriate relief under RCM 905(b)(1). Accordingly, we hold that any defect in the Article 32 investigation based on the Government's failure to disclose impeachment evidence was waived.

*Selective and Vindictive Prosecution*

■ Finally, appellant asserts that "the legal office's highly disparate handing [sic] of allegations of adultery concerning the Appellant, Lieutenant [D], and Lieutenant [R]" was the result of Maj Bloom's prosecutorial misconduct and his exercise of unlawful command influence. Appellant argues that the disparate treatment was exacerbated by Maj Bloom's appointment of Capt Knapp instead of an area defense counsel as counsel for 2Lt D. Final Brief at 20.

LtCol Gilbert testified that he initially offered nonjudicial punishment to appellant for adultery, but that he later preferred charges after appellant violated the "no-contact" order. He testified that the decision to prefer charges was his, after consulting with the

SJA and the "senior leadership" at Reese AFB.

Concerning 2Lt D, LtCol Gilbert testified that he learned that 2Lt D was "having an affair" before his divorce was final. LtCol Gilbert determined that 2Lt D had "received some bad advice" from his civilian attorney who had advised him, "Get on with your life. Do what you want to do. You're divorced. Essentially, it's a done deal." LtCol Gilbert ordered 2Lt D to stay away from the woman with whom he was involved, until the divorce was final. He testified, "To my knowledge, [D] avoided all contact until the divorce was final." Because 2Lt D was a member of the Air National Guard, LtCol Gilbert notified his National Guard commander of the incident and gave 2Lt D an administrative letter of reprimand for adultery.

The third incident involved 2Lt R, who initially denied committing adultery when questioned in LtCol Gilbert's presence but later admitted it. LtCol Gilbert initiated nonjudicial punishment because he "felt that it was right in line with what I had done with" appellant. LtCol Gilbert gave 2Lt R a "no-contact" order. To the best of his knowledge, 2Lt R obeyed it.

Maj Bloom testified that he appointed Capt Knapp to assist 2Lt D in connection with the letter of reprimand because Capt Knapp previously had assisted 2Lt and Mrs. D in a legal assistance capacity. Maj Bloom further testified that he was not aware that Capt Knapp had talked to LtCol Gilbert about the "no-contact" order. He testified that he "knew we were looking at a Letter of Reprimand" because 2Lt D was a "Guard troop," not subject to the Uniform Code of Military Justice. *See* Art. 2(a)(3), UCMJ, 10 USC § 802(a)(3) (members of Air National Guard subject to UCMJ "only when in Federal service").

In her oral announcement of findings and rulings, the military judge stated:

I found Lieutenant Colonel Gilbert to be a highly credible witness, that he clearly articulated his reasoning for his decisions ... regarding the three lieutenants in the case; ... I would particularly note that his reasonable concerns with maintaining good

order and discipline in his squadron and his particular concern that to [sic] the obedience of his orders by these young officers, flying officers, who were in flight training who are in a very potentially dangerous endeavor with expensive aircraft, and his concern and his assessment of the case and his decision was not—this court's findings was not in any way vindictive or selective in it's [sic] determination to take this particular case to trial.

In her written findings of fact and ruling on the motion to dismiss because of unlawful command influence, the military judge found "that LtCol Gilbert clearly articulated his rationale for his course of action regarding ... [appellant], Lt [D], and Lt [R], and that his rationale was clearly supported by the evidence." With respect to the appointment of Capt Knapp as counsel for 2Lt D, the military judge found that Maj Bloom's actions "were not improper nor improperly motivated."

The burden of persuasion on a claim of selective prosecution is on the moving party. *See* RCM 905(c)(2)(A). To support a claim of selective or vindictive prosecution, an accused has a "heavy burden" of showing that "others similarly situated" have not been charged, that "he has been singled out for prosecution," and that his "selection ... for prosecution" was "invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *United States v. Garwood*, 20 MJ 148, 154 (CMA 1985), quoted in *United States v. Hagen*, 25 MJ 78, 83 (CMA 1987). Prosecutorial authorities and convening authorities are presumed to act without bias. Appellant had the burden of rebutting that presumption. *Hagen, supra* at 84.

The record before us does not present a *prima facie* case of vindictive or selective prosecution. LtCol Gilbert treated appellant and 2Lt R equally by initiating nonjudicial punishment against each. He preferred charges against appellant only after appellant violated the "no-contact" order. 2Lt R complied with that order. 2Lt D was disciplined differently because he was a member

of the National Guard, not subject to nonjudicial punishment under the UCMJ. On this record, we hold that the military judge did not err when she concluded that there was no evidence of selective or vindictive prosecution.

## Decision

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judge CRAWFORD concur.

EFFRON, Judge (concurring):

This appeal involves disputes among the judge advocates within the Office of the Staff Judge Advocate (SJA) to the special court-martial convening authority, who was subordinate to the general court-martial convening authority in this case. These disputes involve activities that resulted in allegations of prosecutorial misconduct and unlawful command influence. These are serious allegations, and the majority is careful to place these matters in context without endorsing activities of the individuals concerned.

The majority opinion, which I join, emphasizes that these disputes did not prejudice appellant in this case because: (1) to the extent that the disputes within the SJA's office raised legal issues pertinent to this case, those issues were resolved appropriately by the military judge; (2) the individuals complaining of the SJA's actions did not demonstrate that they withheld or modified their testimony in this case in any material respect; and (3) these matters did not have any material effect on the conduct of the investigation under Article 32, Uniform Code of Military Justice, 10 USC § 832, the referral decision by the general court-martial convening authority, the conduct of the court-martial, or the review of the court-martial. I concur that these reasons provide a sufficient basis to affirm the decision below.

SULLIVAN, Judge (concurring in the result):

I agree with the majority that appellant's case may be affirmed under our case law.

Nevertheless, I conclude that one must step closer and take a harder look at the facts of this case in order to reach this just result. *See generally United States v. Drayton,* 45 MJ 180, 183 (1996) (Sullivan, J., dissenting).

This is an important case. It is really about fairness in the military justice system and the concern of Congress that military prosecutions be perceived as fair by servicemembers *and the American public.* Art. 37, Uniform Code of Military Justice, 10 USC § 837. Appellant challenges as unfair the decision of military authorities to prosecute him for adultery and related offenses while not prosecuting two fellow officers in his flight training class for similar offenses. At first glance, the difference in treatment may be justified by the Government on the basis of appellant's continued adultery in violation of his squadron commander's "no-contact" order. However, questions concerning the validity of this order and the propriety of the actions of the staff judge advocate (SJA) with respect to the pretrial investigation under Article 32, UCMJ, 10 USC § 832, of this case must be squarely faced. On these key issues, I am concerned that the conduct of the SJA may have unnecessarily jeopardized public confidence in this prosecution.

"Facts do not cease to exist because they are ignored." *United States v. Hoggard,* 43 MJ 1, 9 (1995) (Sullivan, J., dissenting). Here, two facts are largely overlooked by the majority opinion, but I am sure they will not be overlooked by critics of this system of justice. First, the base SJA as well as his subordinate attorneys who were called as witnesses during the pretrial investigation were all factually involved with the issuance of the "no-contact" order. Second, the SJA himself was the subject of the pretrial investigating officer's additional inquiry into whether the witnesses at the investigation (Captain (Capt) Knapp and Lieutenant Colonel (Lt Col) Gilbert) were unlawfully influenced in their testimony. In this light, the SJA's conduct during the pretrial investigation cannot on the surface be considered benign (*cf. United States v. Caritativo,* 37 MJ 175, 180 (CMA 1993)); nor can a perceived manipulation of a military justice proceeding be considered an appropriate func-

tion of an SJA. *See United States v. Miller,* 19 MJ 159, 163 (CMA 1985); *see generally* H. Moyer, *Justice and The Military* § 3–180 at 712–13 (1972) (Judge Ferguson's testimony that the SJA, not the commander, may be the real source of trouble on tampering with courts-martial).

More particularly, Major (Maj) Bloom was the SJA of the special court-martial convening authority who ordered the pretrial investigation. He also was directly involved in the matter which was the subject of the pretrial investigation. The record * shows:

Maj Bloom advised Lt Col Gilbert on the issuance of the "no-contact" order to appellant. (R. 46, 49)

*Maj Bloom* participated in the subsequent command investigation of appellant for the violation of the above order. (R. 57, 60)

*Maj Bloom* received the sworn charges from Lt Col Gilbert, the accuser of appellant, and signed the order for another commander designating Capt Feliciani as the pretrial investigating officer.

*Maj Bloom* discussed with his assistant staff judge advocates (Capts Welsh and Knapp) their expected testimony regarding factual and legal issues concerning the "no-contact" order prior to the investigation. (R. 285–87)

*Maj Bloom* made *ex parte* contact with the pretrial investigating officer (Capt Feliciani) advocating the legality of the "no-contact" order and also received copies of his subordinates' testimony. (R. 290, 337)

*Maj Bloom* made *ex parte* contact with the pretrial investigating officer (Capt Feliciani) concerning the need to reopen the pretrial investigation to investigate unlawful command-influence questions concerning his own conduct. (R. 288–89)

*Maj Bloom* contacted a judge advocate (Capt Knapp) in his office regarding his expected testimony concerning the unlawful command-influence questions to be investigated. (R. 289)

*Maj Bloom* conducted a "performance feedback session" with his deputy staff judge advocate (Capt Knapp) after the Article 32 Investigation but before trial which

in some way addressed the latter's testimony at the Article 32 Investigation. (This is not a quotation.)

If viewed harshly by a member of the public, the above actions may indicate that (1) there was an intrusion of a senior military attorney (a major) on the quasi-judicial duties of the Article 32 investigating officer (a captain); and (2) the major's discussions and questioning of two subordinates (both captains) before the pretrial investigation and one after he testified constituted an attempt to influence the outcome of the pretrial investigation. These perceptions of unfairness are not unreasonable; yet, they do not require reversal where, as here, no reasonable possibility of prejudice exists.

The process of a criminal prosecution may be viewed as a plant that grows in the soil of justice. The majority here has looked at this case only as to the results which are above ground—the referral of the case for trial, the trial, and the appeal. The majority has declared this referral, trial, and appeal fair and valid, and I agree. However, my view also goes beneath the ground to critically look at the main root of this criminal process—the pretrial investigation (the military equivalent of the grand-jury process). If this root is rotten, then the entire plant will eventually fail and die. I find the root damaged by the interference of the SJA, but the damage is not fatal.

Basically, the pretrial investigation did uncover the truth of the matter—appellant did commit adultery and he did repeatedly disobey a valid and lawful order to cease contact with his partner in adultery. Any attempt by the SJA to insure that the pretrial investigator would find the "no-contact" order to be lawful in the first instance was unnecessary. The commander had a legitimate reason for keeping appellant away from a fellow officer's wife and, in the flight-training circumstances of this case, the need for such an order was obvious. *See generally United States v. Frazier,* 34 MJ 194 (CMA 1992) (sexual conduct of officer may impact command). Furthermore, it was the repeated disobedience of that order which substantially distinguished appellant's case from his fel-

---

* These are not direct quotations, but a list of factual summaries of the actual record in this case.

low officers. Accordingly, I would affirm the decision below upholding his court-martial conviction, although I take a less-traveled path to the affirmance.