UNITED STATES, Appellee

v.

Stanley E. EDMOND, Staff Sergeant
U.S. Army, Appellant

No. 03-0086

Crim. App. No. 9900904

United States Court of Appeals for the Armed Forces

Argued April 20, 2006

Decided August 9, 2006

ERDMANN, J., delivered the opinion of the court, in which
GIERKE, C.J., and CRAWFORD, EFFRON, and BAKER, JJ., joined.

Counsel

For Appellant:  Captain Scott T. Ayers (argued); Colonel John T.
Phelps II, Colonel Robert D. Teetsel, Lieutenant Colonel Kirsten
V. C. Brunson, Lieutenant Colonel E. Allen Chandler Jr., Major
Imogene M. Jamison, Major Charles L. Pritchard Jr., Major Billy
B. Ruhling II, and Captain Kathy Martin (on brief).

For Appellee:  Captain Mason S. Weiss (argued); Lieutenant
Colonel Margaret B. Baines, Lieutenant Colonel Theresa A.
Gallagher, and Major William J. Nelson (on brief).

Amicus Curiae for Appellant:  John Heck (law student) (argued);
Kathleen A. Duignan, Esq. (supervising attorney), Eugene R.
Fidell, Esq., Marisa Guevara (law student), Eric Iverson (law
student), and Tae Hwi Lee (law student) (on brief) – for the
National Institute of Military Justice.

Military Judges:  Ferdinand Clervi (arraignment), Theodore Dixon
(trial), and Robert L. Swann (DuBay hearing).

**This opinion is subject to revision before final publication.**

United States v. Edmond, No. 03-0086/AR

Judge ERDMANN delivered the opinion of the court.[1]

Staff Sergeant Stanley E. Edmond was tried at a general court-martial by a panel of officer and enlisted members. He was convicted of conspiracy to commit larceny, absence without leave, false official statements, wrongful disposition of military property, wrongful use of controlled substances, larceny, and theft of services, in violation of Articles 81, 86, 107, 108, 112a, 121 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 886, 907, 908, 912a, 921, 934 (2000). He was sentenced to a reduction in grade to E-1, confinement for seventy-three days, and a bad-conduct discharge. The convening authority approved the sentence and credited Edmond with seventy-three days of pretrial confinement credit. The United States Army Court of Criminal Appeals set aside and dismissed a charge affected by an erroneous staff judge advocate's post-trial recommendation but affirmed the remaining findings and the sentence. United States v. Edmond, No. ARMY 9900904, slip op. at 3 (A. Ct. Crim. App. Sept. 17, 2002).

This court initially granted Edmond's petition for review on the issue of witness interference and concluded that further

---

[1] We heard oral argument in this case at the Washington College of Law, American University, as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 326, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

2

United States v. Edmond, No. 03-0086/AR

inquiry was necessary. United States v. Edmond, 58 M.J. 237 (C.A.A.F. 2003). We set aside the decision of the Army court and directed the lower court to obtain affidavits and, if necessary, to conduct additional factfinding pursuant to United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967). Id. After reviewing the affidavits submitted by the trial participants, the lower court ordered a DuBay hearing. United States v. Edmond, No. ARMY 9900904, slip op. at 3 (A. Ct. Crim. App. June 2, 2005). Following the DuBay hearing, the military judge issued "Essential Findings and Conclusions of Law" which found no prosecutorial misconduct. On appeal to the Army court, Edmond argued that the DuBay judge erred in finding no prosecutorial misconduct and also asked the court to conclude that his defense attorney had provided ineffective assistance of counsel. Id. The Army court agreed with the DuBay judge that there was "no evidence of prosecutorial misconduct" and further concluded that Edmond's defense counsel was not ineffective. Id. at 4-6. The lower court once again affirmed the findings and sentence. Id. at 6.

In a due process analysis of prosecutorial misconduct this court looks at the fairness of the trial and not the culpability of the prosecutor. See Smith v. Phillips, 455 U.S. 209, 219 (1982). Even where we find misconduct on the part of the prosecutor, this court will go on to look at the "overall effect

3

United States v. Edmond, No. 03-0086/AR

of counsel's conduct on the trial, and not counsel's personal blameworthiness." United States v. Thompkins, 58 M.J. 43, 47 (C.A.A.F. 2003). The first granted issue addresses whether the lower court erred in concluding that there was no prosecutorial misconduct in this case.[2]

When reviewing claims of ineffective assistance of counsel, we are guided by the two-pronged test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).

> First, an appellant must show that counsel's performance fell below an objective standard of reasonableness -- that counsel was not functioning as counsel within the meaning of the Sixth Amendment.
>
> The second prong of an appellant's burden requires a showing of prejudice flowing from counsel's deficient performance. The appellant must demonstrate such prejudice as to indicate a denial of a fair trial or a trial whose result is unreliable.

United States v. Davis, 60 M.J. 469, 473 (C.A.A.F. 2005) (citations omitted). The second granted issue addresses whether

---

[2] We granted review of the following issue:

> WHETHER THE ARMY COURT ERRED WHEN IT CONCLUDED THAT THERE WAS NO EVIDENCE OF PROSECUTORIAL INTERFERENCE IN APPELLANT'S CASE, AND AS A RESULT, APPELLANT WAS DEPRIVED OF HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS AND SIXTH AMENDMENT RIGHT TO COMPULSORY PROCESS.

trial defense counsel was ineffective when he failed to inquire into a defense witness's decision not to testify at trial.[3]

## BACKGROUND

Edmond was convicted of numerous charges, including conspiring to commit larceny of two cellular telephones and the larceny of two cellular telephones. These two charges are central to this appeal. Edmond's alleged coconspirator was Derrick McQueen,[4] a friend with whom he worked in the supply shop. Prior to Edmond's trial, Captain Jason Libby, Edmond's trial defense counsel, spoke with McQueen about testifying on behalf of Edmond. McQueen told Libby that he did not believe his testimony could help Edmond and that he did not want to testify. Libby nonetheless subpoenaed McQueen.

When McQueen arrived at the courtroom on the day of Appellant's trial he met not with Libby but with Major Jeffery Bovarnick, the trial counsel. McQueen testified that he did not

---

[3] We granted review of the following issue:

> WHETHER APPELLANT'S TRIAL DEFENSE COUNSEL
> WAS INEFFECTIVE WHEN HE FAILED TO PERSONALLY
> INQUIRE WHY A MATERIAL DEFENSE WITNESS
> REFUSED TO TESTIFY AFTER THE WITNESS SPOKE
> WITH THE PROSECUTOR, AND AFTER TRIAL DEFENSE
> COUNSEL WAS INFORMED THAT THE SAME WITNESS
> HAD ALLEGEDLY INVOKED HIS FIFTH AMENDMENT
> RIGHT AGAINST SELF-INCRIMINATION.

[4] At the time of the alleged offense, McQueen was a sergeant in the United States Army. At the time of Edmond's trial he was a civilian, having been administratively discharged from the Army in lieu of facing court-martial charges.

5

specifically remember the conversation that he had with Bovarnick, but he remembered being told that "if you perjure yourself or if new information comes out, new charges can be brought against you." He said that he did not feel threatened by Bovarnick, but he felt if he testified his administrative discharge could be revoked and he "could . . . be charged again." McQueen said that he had planned to testify at the court-martial, but Bovarnick told him he could either testify or not testify, so he chose not to because he "didn't want to be there anyway." After McQueen told Bovarnick he was going to leave, Bovarnick told McQueen that he would "inform who I need to inform that you don't want to testify." Bovarnick left the room, and when he returned told McQueen he was "free to go." McQueen then left the courthouse.

McQueen stated that had he testified at Edmond's trial, he "planned on telling the truth," and he did not recall having refused to testify because he did not want to incriminate himself. When asked what he would have said if he had testified, McQueen said that he and Edmond were tasked with obtaining cell phones for the battalion and that he believed they were authorized to obtain them. He stated that at the time they obtained the phones they intended to return the cell phones to the unit for their authorized use. He also testified that there was no agreement between the two of them to keep the cell

6

phones before they returned to the unit, but after they were told the unit no longer wanted the cell phones they decided to keep the phones for their own personal use. He could not recall any conversation between the two of them during which they agreed to misuse the telephones they had obtained.

Bovarnick testified that prior to the trial he met with McQueen and that during the meeting he called Captain Karen Beyea, a Special Assistant United States Attorney, into the room. He stated that during that meeting he asked McQueen what his testimony would be and McQueen told him he would testify that he and Edmond were authorized by the command to obtain the phones. Based on the expected testimony of two Government witnesses who would testify that McQueen and Edmond were not authorized to obtain or use the phones, Bovarnick concluded that McQueen was lying and would commit perjury if he testified. As McQueen was a civilian, Bovarnick asked Beyea to "let him [McQueen] know what the potential repercussions would be for committing perjury."

Bovarnick testified that he did not inquire any further into McQueen's expected testimony but based on what McQueen told him, he did not believe that the testimony McQueen would give would have been exculpatory because "that is not what happened by all the facts that are present in the case. . . . It wouldn't have been because that is just not what happened." He

7

did agree, however, that if McQueen testified that there was no conspiracy between McQueen and Edmond before they obtained the phones to acquire them for personal use, then that would be exculpatory testimony.

In regard to McQueen's decision not to testify, Bovarnick stated that following their conversation, McQueen apparently decided to "change his mind and not testify." He stated that the stipulation of fact was entered into because the defense wanted to call McQueen to the stand, but was informed by someone that McQueen would invoke his Fifth Amendment privilege. Bovarnick testified that he did not know who told trial defense counsel that McQueen would invoke his rights, but that McQueen "told somebody."

Edmond's trial defense counsel, Libby, testified that he could not remember what exculpatory information McQueen could have provided to the members, but he stated that at the time of Edmond's court-martial he believed McQueen's testimony would be favorable to Edmond. He also testified that on the day of trial he did not speak to McQueen, but was informed by trial counsel that McQueen did not want to testify in the case. He admitted he did not speak to McQueen and receive this information himself, though he "probably should have." He also stated that he should have done more to preserve the record on the question of whether and why McQueen was invoking his Fifth Amendment

rights in refusing to testify.

In lieu of having Beyea testify the parties agreed the DuBay judge could consider her affidavit. In her affidavit Beyea explained that Bovarnick told her that based on McQueen's attitude and demeanor he did not believe McQueen was going to tell the truth and she agreed with that assessment. She stated that based on their conclusion that McQueen was untrustworthy, they determined they had an obligation to inform McQueen "of the consequences of perjury based on our information and belief that McQueen was not going to be truthful." She said she then informed McQueen of the consequences of perjury and explained that if he perjured himself "the government would seek justice" even though he was a civilian. She also stated she explained to McQueen that they were not pressuring him not to testify, but that "as officers of the court, [they] merely wanted to make sure that he was informed before he testified."

At the conclusion of the defense case, the defense entered a stipulation of fact into evidence that stated that if he were called to testify, McQueen would invoke his Fifth Amendment right against self-incrimination. The military judge questioned Edmond regarding his wish to enter into the stipulation of fact, asking whether his trial defense counsel had explained the stipulation to him, whether he knew that he had "an absolute right to refuse" to enter into the stipulation, and whether he

believed it was in his best interest to enter into the stipulation of fact.  Edmond responded that he did, and the stipulation of fact was entered into evidence.

DISCUSSION

The two granted issues in this case -- whether there was prosecutorial misconduct in interfering with and releasing a subpoenaed defense witness and whether Edmond's defense attorney was ineffective by failing to talk with a potentially exculpatory defense witness before agreeing to release the witness -- are closely intertwined.

I.   PROSECUTORIAL MISCONDUCT

We turn first to the question of whether the trial counsel engaged in misconduct in his discussions with McQueen on the day of Edmond's trial.  In evaluating issues of prosecutorial misconduct we review the military judge's findings of fact to determine whether they are clearly erroneous.  United States v. Argo, 46 M.J. 454, 457 (C.A.A.F. 1997).  "The questions whether the facts found by the military judge constitute prosecutorial misconduct and whether such misconduct was prejudicial error are questions of law that we review de novo."  Id. (citing United States v. Meek, 44 M.J. 1, 5-6 (C.A.A.F. 1996); United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F. 1996)).  "Prosecutorial misconduct is 'action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional

10

United States v. Edmond, No. 03-0086/AR

provision, a statute, a Manual rule, or an applicable professional ethics canon.'" Id. (quoting Meek, 44 M.J. at 5).

As the DuBay judge noted in his conclusions of law, this court has held that "[s]everal legal norms are violated when a trial counsel attempts to or unlawfully dissuades a defense witness from testifying at a court-martial." Meek, 44 M.J. at 5; see also Webb v. Texas, 409 U.S. 95, 98 (1972) (holding that the defendant's due process rights were violated when the trial judge singled out the only defense witness and indicated to that witness that he expected the witness to lie and would personally ensure that the witness was prosecuted for perjury and thereby "effectively drove that witness off the stand"); United States v. Vavages, 151 F.3d 1185, 1189 (9th Cir. 1998) (concluding that although perjury warnings are not improper per se, it may be prosecutorial misconduct if "the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness' decision whether to testify"); United States v. Heller, 830 F.2d 150, 153-54 (11th Cir. 1987) (concluding that when a government agent intentionally threatened and attempted to scare a defense witness concerning his testimony on behalf of the defendant, the defendant had "been deprived of an important defense witness by substantial interference on the part of the government" and was therefore entitled to a new trial); United States v. Hammond,

11

598 F.2d 1008, 1012-13 (5th Cir. 1979) (noting that "'substantial government interference with a defense witness' free and unhampered choice to testify violates due process' rights of the defendant" and concluding that a government statement to a witness that he would have "nothing but trouble" if he testified on behalf of defense requires reversal (quoting United States v. Henricksen, 564 F.2d 197, 198 (5th Cir. 1977))); United States v. Morrison, 535 F.2d 223, 229 (3d Cir. 1976) ("[P]rosecutorial misconduct caused the defendant's principal witness to withhold out of fear of self-incrimination testimony which would otherwise allegedly have been available to the defendant.").

The DuBay judge found no unlawful attempts by Bovarnick and Beyea to dissuade McQueen from testifying, but rather found that the purpose of the meeting among Bovarnick, Beyea and McQueen was to inform McQueen that he could be prosecuted as a civilian if he perjured himself. He also found that this warning was given "to protect Mr. McQueen and not for the purpose of influencing him against testifying" and that McQueen was not threatened or intimidated in any way. Finally, he found that McQueen did not testify because he did not want to be involved in the prosecution of his friend and that regardless, "whatever Mr. McQueen would have said, he could not have helped this accused."

Initially, it is questionable whether it was proper for Bovarnick to warn McQueen about the consequences of perjury. McQueen told Bovarnick he would have testified that he believed he and Edmond had authorization to obtain the phones in question. Bovarnick testified that this was contrary to the testimony of two Government witnesses who would testify that McQueen and Edmond did not have authority to obtain the phones, but only the authority to look into getting the phones. Bovarnick stated that because McQueen's potential testimony contradicted that of his witnesses, he believed it was a lie. He told McQueen he knew McQueen was lying and if McQueen testified as he proposed then he would be prosecuted for perjury.

The United States Court of Appeals for the Ninth Circuit has stated:

> That [the witness]'s testimony would have contradicted the testimony of the government's own witnesses does not form a sufficient basis for the prosecutor's warning. Rather, unusually strong admonitions against perjury are typically justified only where the prosecutor has a more substantial basis in the record for believing the witness might lie -- for instance, a direct conflict between the witness' proposed testimony and her own prior testimony.

Vavages, 151 F.3d at 1190. Bovarnick has provided no basis for concluding that McQueen's testimony would be a lie other than McQueen's "demeanor" and the fact that his testimony

13

contradicted the testimony of Government witnesses.  Bovarnick

did not testify that he relied on any evidence that McQueen had

previously stated he did not actually believe he and Edmond were

authorized to obtain the phones when they did so.  In fact,

McQueen's potential testimony was consistent with Edmond's

version of events surrounding the acquisition of the cell phones

in his sworn statements made to investigators.

Even if the proposed testimony of the Government's

witnesses was truthful -- that McQueen did not actually have

authority to obtain the phones -- that would not automatically

lead to the conclusion that McQueen was lying when he said that

he believed he had the authorization.  It is not uncommon in

litigation, or in life in general, for individuals to have

different perceptions of the same event.  The fact that two

witnesses have conflicting views of an event does not mean,

without more, that either witness is intentionally testifying

falsely.  Here the difference in the testimony was that the

Government witnesses would testify that Edmond and McQueen were

only authorized to look into obtaining the cell phones while

McQueen would testify that he thought they had authority to

acquire the cell phones.

In addition, Bovarnick did more than simply give a perjury

warning to McQueen.  He told him, "I know that that is a lie. .

. . I am going to make sure that the S.A.U.S.A. [Special

Assistant United States Attorney] sits in and listens to you testify to that and then basically admonish you -- not admonish you, but let him know what the potential repercussions would be for committing perjury." Following that, Beyea, the Special Assistant United States Attorney, informed McQueen "of the consequences of perjury based upon our information and belief that McQueen was not going to be truthful." She explained if he perjured himself "the government would seek justice" even though he was a civilian.

The United States Court of Appeals for the Ninth Circuit has held that a prosecutor "substantially interfered" with a witness's decision to testify where he "combined a standard admonition against perjury -- that [the defense witness] could be prosecuted for perjury in the event she lied on the stand -- with an unambiguous statement of his belief that [the witness] would be lying if she testified in support of [the defendant's] alibi." Vavages, 151 F.3d at 1190. The court concluded that "the additional statement served as no more than a thinly veiled attempt to coerce a witness off the stand." Id.

Bovarnick and Beyea speculated that McQueen's proposed testimony was a lie and combined it with a warning that the Government would prosecute McQueen if he testified. This combination substantially interfered with McQueen's decision to testify by causing him to believe that if he went into the

15

courtroom and testified as he intended he would be "charged again," despite the fact that there were no grounds established at the DuBay hearing to believe that he intended to do anything other than testify truthfully.

We conclude, therefore, that the DuBay judge's finding that the purpose of the warning was to protect McQueen and not to influence him not to testify was clearly erroneous. We conclude that the trial counsel's actions substantially interfered with McQueen's decision whether to testify and had the effect of unlawfully dissuading a subpoenaed defense witness from testifying at Edmond's court-martial. See Meek, 44 M.J. at 5 ("Several legal norms are violated when a trial counsel attempts to or unlawfully dissuades a defense witness from testifying at a court-martial.").[5]

We next turn to the DuBay judge's finding that "McQueen did not testify because he didn't want to testify. Although I can't identify who gave Mr. McQueen the option to testify or not testify, no one forced his decision one way or another." This

---

[5] We emphasize that our analysis is fact-specific, and that prosecutors and military judges may provide appropriate information to witnesses about the consequences of perjury. "'It is not improper per se for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify.'" United States v. Hooks, 848 F.2d 785, 799 (7th Cir. 1988) (quoting United States v. Blackwell, 694 F.2d 1325, 1334 (D.C. Cir. 1982)).

finding is also inconsistent with the evidence before us. Beyea's affidavit clearly states that she and Bovarnick told McQueen it was his "his decision about testifying at Edmond's court-martial." McQueen testified Bovarnick told him he could testify or not testify and he chose not to because he "didn't want to be there anyway." The finding that it was impossible to identify who gave McQueen the option to testify or not testify is clearly erroneous as the record reflects that Bovarnick and Beyea told him he had that option.

This conversation and the subsequent release of McQueen as a witness are particularly problematic as McQueen was under a subpoena requested by the defense and could not choose to leave without testifying unless the defense agreed to release him and the subpoena was quashed by the military judge. Under Rule for Courts-Martial (R.C.M.) 703(b)(1), a party "is entitled to the production of any witness whose testimony on a matter in issue on the merits . . . would be relevant and necessary." The trial counsel is obligated to arrange for the presence of any witness requested by the defense "unless the trial counsel contends that the witness' production is not required under this rule." R.C.M. 703(c)(2)(D). After subpoenaing McQueen on behalf of the defense, Bovarnick was not authorized to tell McQueen that he could choose to either testify or not testify.

17

While the record concerning the advisement and invocation of McQueen's Fifth Amendment rights is unclear, one thing is certain -- nothing in the record reflects that any attorney involved in this proceeding advised McQueen of his Fifth Amendment rights and McQueen does not remember either being advised of those rights or invoking them. Bovarnick testified he did not advise McQueen of his rights nor did he know who McQueen told that he was invoking his Fifth Amendment rights, but that "he told somebody." McQueen, however, only met that day with Bovarnick and Beyea. Defense counsel did not meet with McQueen at all that day and did not remember how he found out that McQueen was going to invoke his rights. His only recollection regarding McQueen's decision not to testify was that Bovarnick informed him that McQueen chose not to testify in the case, but he did not inquire further into McQueen's reasons for this decision.

In summary, Bovarnick's speculation that McQueen would perjure himself does not provide a basis for telling McQueen he did not have to testify. There is no evidence that McQueen had been advised of or was invoking his Fifth Amendment rights when Bovarnick told McQueen he was free to leave. Bovarnick's release of McQueen from the subpoena added to the substantial interference with McQueen's decision not to testify on behalf of the defense.

18

United States v. Edmond, No. 03-0086/AR

Although we conclude that the prosecution's actions substantially interfered with McQueen's decision whether or not to testify, that does not end the prosecutorial misconduct analysis. Even if we were to find misconduct on the part of the prosecutor, this court will go on to look at the "overall effect of counsel's conduct on the trial, and not counsel's personal blameworthiness." Thompkins, 58 M.J. at 47. "In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." United States v. Fletcher, 62 M.J. 175, 184 (C.A.A.F. 2005). Our prosecutorial misconduct analysis is closely intertwined with the question of whether Edmond's defense attorney was ineffective by failing to talk with a potentially exculpatory defense witness before agreeing to release the witness. We therefore need to assess the impact of trial counsel's actions on the integrity and fairness of Edmond's trial in light of the defense counsel's inaction and acquiescence in entering into the stipulation of fact that McQueen would invoke his Fifth Amendment rights if called to testify without personally discussing that decision with McQueen.

II.  INEFFECTIVE ASSISTANCE OF COUNSEL

As noted, we apply the two-pronged test for ineffective assistance of counsel set forth by the United States Supreme

19

Court in Strickland. Under this test "an appellant must show that counsel's performance fell below an objective standard of reasonableness -- that counsel was not functioning as counsel within the meaning of the Sixth Amendment" and the appellant must demonstrate that "there is a reasonable probability that, but for counsel's error, there would have been a different result." Davis, 60 M.J. at 473. Our review of counsel's performance is highly deferential and is buttressed by a strong presumption that counsel provided adequate professional service. See United States v. Garcia, 59 M.J. 447, 450 (C.A.A.F. 2004). The presumption of competence is rebutted by a showing of specific errors made by defense counsel that were unreasonable under prevailing professional norms. United States v. McConnell, 55 M.J. 479, 482 (C.A.A.F. 2001).

We note that Appellant's trial defense counsel, Libby, testified at the DuBay hearing that he was informed by trial counsel that McQueen did not want to testify in the case. He admitted he did not speak to McQueen and receive this information himself, but that he "probably should have." He also conceded he should have done more to preserve the record on the question of whether and why McQueen was invoking his Fifth Amendment rights in refusing to testify.

These admissions are striking in light of Libby's stated belief that McQueen had testimony that was favorable to his

client, even if he could not remember what that testimony would have been. In fact, McQueen's testimony at the DuBay hearing revealed that he would have corroborated Edmond's statements to investigators that they believed they had been authorized to obtain the cell phones and that they had no agreement to keep the phones.

At the time of trial Libby requested that McQueen be subpoenaed so that he could obtain his testimony on behalf of Edmond. Despite this initial effort to secure McQueen's testimony, when Libby was informed that McQueen would not testify he did not ask to meet with McQueen to determine the substance of his testimony or whether he had been properly advised of his Fifth Amendment rights or was in fact asserting those rights. Instead, he entered into a stipulation of fact that had the effect of releasing McQueen from his obligation to testify and allowing a corroborating witness to leave the courthouse without testifying.

The lower court concluded that entering into the stipulation of fact was a reasonable tactical decision by the defense. Edmond, No. ARMY 9900904, slip op. at 5-6. Libby, however, never alleged at the DuBay hearing that he had made a tactical decision, but rather admitted that he should have made further inquiry into the events surrounding the stipulation of fact. Furthermore, even if Libby ultimately might not have

21

chosen to have McQueen testify, he certainly -- as Libby himself admits -- "should have" looked into the question further and taken "a better course of action for preserving the record." We see no reasonable explanation for his failure to look into the issue further before entering into the stipulation of fact.

McQueen was present at the courthouse on the day of the trial and Libby could easily have questioned him regarding his decision not to testify. Because McQueen was a subpoenaed defense witness, if Libby wanted him to testify he needed only ask the military judge for a hearing regarding the reasons behind McQueen's refusal to testify and further inquiry would have been made. See R.C.M. 703(b)(3); Military Rule of Evidence 804(a)(1). Instead, he entered into the stipulation of fact without any objection thereby signifying his agreement to McQueen's departure. Libby's failure to take simple steps to secure the testimony of a witness that he had previously deemed relevant and necessary to Edmond's case fell measurably below the level of performance we would expect of a lawyer, and overcomes our presumption of competence. McConnell, 55 M.J. at 482.

The appropriate test for prejudice under Strickland is whether there is a reasonable probability that, but for counsel's error, there would have been a different result. Davis, 60 M.J. at 473; United States v. Quick, 59 M.J. 383, 387

(C.A.A.F. 2004).  The result of Libby's errors was that McQueen's testimony was never heard by the members.  McQueen would have testified that he and Edmond were tasked with obtaining cell phones for the battalion and he believed they were authorized to obtain them.  He also would have stated that at the time they obtained the phones they intended to return the cell phones to the unit for their authorized use.  He would have testified there was no agreement between the two of them to keep the cell phones, but after they were told the unit no longer wanted the cell phones they simply kept the phones for their own personal use.  Finally, McQueen could not recall any conversation between Edmond and himself during which they agreed to misuse the telephones they had obtained.

McQueen's proposed testimony raises questions as to certain elements of Charge I (conspiracy to commit larceny) and Charge IV (larceny).  The specification of Charge I alleging a conspiracy to commit larceny required that the two "entered into an agreement . . . to commit an offense under the code."  Manual for Courts-Martial, United States pt. IV, para. 5.b.(1) (2005 ed.) (MCM).  McQueen specifically testified that the two never formed an agreement and his testimony therefore could have raised a question in the members' minds as to whether this element was met.  Additionally, the second element of the conspiracy charge, and the basis for the charge of larceny in

Charge IV, required that the Government prove Edmond committed larceny by "wrongfully" obtaining the cell phones using a "misrepresentation" that he "knows . . . to be untrue. . . ." See MCM pt. IV, para. 5.b.(2); MCM pt. IV, para. 46.b.(1), c.(1)(e). McQueen's testimony that he believed they were authorized to obtain the phones could have raised a question in the members' minds as to whether the two of them obtained the phones "wrongfully."

We also cannot ignore the fact that trial defense counsel did not just fail to secure McQueen's testimony, he went on to enter the stipulation of fact into evidence, thereby placing before the members the information that Edmond's coconspirator could not testify without incriminating himself. Nor can we ignore the fact that Bovarnick specifically told the members in his closing argument that they could not hear from McQueen about whether there was an agreement between him and Edmond to obtain the cell phones because he had invoked his "right against self-incrimination."

Because McQueen's testimony could have raised these questions in the members' minds, there is a reasonable possibility that without Libby's error there would have been a different result. Therefore, we conclude that trial defense

counsel provided ineffective assistance and we set aside the guilty findings for Charge I and Charge IV.[6]

CONCLUSION

The decision of the United States Army Court of Criminal Appeals is reversed as to Charge I and Charge IV, and the findings of guilty to those charges and the sentence are set aside.  The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals. That court may either dismiss Charge I and Charge IV and reassess the sentence, or it may order a rehearing.

---

[6] We note that Edmond was charged separately for wrongfully disposing of the cellular telephones and wrongfully obtaining service for the phones, and that these charges are not affected by our decision today.