# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40392**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Isaac J. SERJAK**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 11 December 2024

————————————

*Military Judge*: Lance R. Smith.

*Sentence*: Sentence adjudged 29 July 2022 by GCM convened at Royal Air Force Mildenhall, United Kingdom. Sentence entered by military judge on 22 August 2022: Dishonorable discharge, confinement for 54 months and 100 days, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Spencer R. Nelson, USAF; Frank J. Spinner, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, DOUGLAS, and MASON, *Appellate Military Judges*.

Judge DOUGLAS delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge MASON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

DOUGLAS, Judge:

Contrary to his pleas, a general court-martial composed of officer and enlisted members found Appellant guilty of one specification of sexual assault upon JM and one specification of abusive sexual contact upon HC in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920; one specification of assault consummated by a battery upon BH in violation of Article 128, UCMJ, 10 U.S.C. § 928; and one specification of making a false official statement about JM in violation of Article 107, UCMJ, 10 U.S.C. § 907.[1,2] The trial judge sentenced Appellant to a dishonorable discharge, confinement for 54 months and 100 days, forfeiture of all pay and allowances, and reduction to the grade of E-1.[3] The convening authority took no action on the findings or the sentence. Pursuant to Appellant's request, the convening authority waived the automatic forfeitures for a period of six months, and directed the total pay and allowances be paid to Appellant's spouse for the benefit of her and their dependent child.[4]

Appellant raises eight issues on appeal which we have reworded, whether: (1) he was selectively prosecuted; (2) any taint from undue command influence (UCI) was overcome; (3) a speedy trial violation occurred; (4) his convictions are legally and factually sufficient; (5) Articles 120(b)(2) and (g)(7), UCMJ, 10 U.S.C. §§ 920(b)(2), (g)(7), are unconstitutionally vague; (6) as applied to him, Articles 120(b)(2) and (g)(7), UCMJ, provided fair notice; (7) he was provided five days to rebut Rule for Courts-Martial (R.C.M.) 1106A victim matters; and (8) 18 U.S.C. § 922 is constitutional as applied in Appellant's case. We also considered one additional issue not raised by Appellant identified during this

---

[1] All references in this opinion to the UCMJ and the Rules for Courts-Martial (R.C.M) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Consistent with his pleas, the same general court-martial found Appellant not guilty of one specification of abusive sexual contact in violation of Article 120, UCMJ, and two specifications of assault consummated by a battery in violation of Article 128, UCMJ.

[3] Appellant was credited with 43 days of pretrial confinement.

[4] Because the convening authority took no action on the sentence, he thereby approved the adjudged forfeiture of all pay and allowances. Since the adjudged forfeiture of all pay and allowances was approved, the automatic (mandatory) forfeitures were not triggered by the sentence, and thus were not available to the convening authority to waive. *See United States v. Emminizer*, 56 M.J. 441, 445 (C.A.A.F. 2002). Due to our resolution of raised issues in this case, we do not consider whether relief for this error is warranted. *See United States v. Johnson*, 62 M.J. 31 (C.A.A.F. 2005); *United States v. Arindain*, 65 M.J. 726, 731 (A.F. Ct. Crim. App. 2007).

court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), review: (9) whether we can reliably reassess Appellant's sentence.

With respect to issues (5) and (8), we have carefully considered Appellant's contentions and find that they do not require discussion or warrant relief. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Vanzant*, 84 M.J. 671 (A.F. Ct. Crim. App. 2024) (holding the 18 U.S.C. § 922 firearm prohibition notation included in the staff judge advocate's indorsement to the entry of judgment is beyond a Court of Criminal Appeals' (CCA) statutory authority to review), *rev. granted*, __ M.J. __, No. 24-0182, 2024 CAAF LEXIS 640 (C.A.A.F. 17 Oct. 2024). Appellant's issue (6) is resolved within our factual sufficiency review for his penetrative sexual assault conviction.

We do not address issue (7) because it is mooted by our decision in this case. With respect to issue (4), we determine Appellant's conviction of sexual assault in violation of Article 120, UCMJ, is factually insufficient. The Government charged this offense as "without consent" but erred by failing to prove JM was capable of consenting but did not consent. We therefore set aside the finding of guilty to Specification 3 of Charge II, and dismiss with prejudice.

As to the remaining findings, we find no error materially prejudicial to Appellant's substantial rights and we affirm.

As to the sentence, because we set aside the finding of guilty to Specification 3 of Charge II, we considered the totality of the circumstances, including the *Winckelmann*[5] factors. We cannot reliably determine that, absent the error, the "sentence would have been at least of a certain magnitude." *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000) (citation omitted). Therefore, we also set aside the sentence and authorize a rehearing.

## I. BACKGROUND

Appellant was single and living in the dorms at his first duty assignment, Royal Air Force (RAF) Mildenhall, United Kingdom. Upon arrival, he was quarantined in his room, as a matter of routine precaution for all inbound personnel. While quarantined in his room, he saw HC walking outside in the parking lot. Appellant "shouted" from inside his room and asked her if she could get him some food. She did not know him but agreed to help. She brought him food and left it outside his door. This was sometime in October or November 2020.

Appellant and HC exchanged contact information; they were both assigned to the same squadron, but they did not work together. HC described their relationship as casual at first, but then said situations became "really weird" due

---

[5] *United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013).

to Appellant's sexual comments. Appellant lived two doors down from HC and he borrowed her Wi-Fi a couple of times. Appellant sent HC a text with a picture of himself and wrote, "God the things I would do if you [were] straight." Since she was "gay," Appellant would also bring up threesomes and "different positions." HC told him she was not one to be with men.

On 9 January 2021, in the evening, Appellant randomly showed up at HC's dorm room and began pounding on her door. HC was asleep. She got up and answered the door. Appellant came into HC's room and shut the door behind him. Appellant started leaning into her, so HC put her hands on his mouth. He said, "[N]o, I was just going to go in for a hug," and he put his arms around her waist. HC patted Appellant's back and smelled alcohol on his breath. Appellant kept his arms around her and sat on the edge of her bed. He stated that he had feelings for her even though he knew she was gay. HC responded by explaining she had no reciprocal feelings for him. He asked if he could stay with her overnight. She explained that she had to get up early in the morning, so he couldn't stay. Appellant took his hands, ran them "down [her] body and tried to like, lift [her] up and turned toward the bed." When he tried to lift her up, his "fingers were near the like, the crack of [her] butt." HC grabbed his hands and planted her feet. At that point, he backed up and kissed her forehead. Appellant did eventually leave.

A month later, Appellant was with a different female, BH. BH was also friends with HC and a member of the same squadron as HC and Appellant. On 11 February 2021 after 2200 hours, Appellant went to BH's dorm room because he was bored. BH thought Appellant might try to help fix her car as he had previously suggested. Instead, Appellant showed BH short videos of himself sparring with others while at the gym, and then he picked a movie they watched together on BH's computer, while both were on BH's bed. Appellant asked for a back massage, and BH patted him over his clothes. After watching the movie for some time, Appellant closed the computer and got on top of BH. He kissed her on the neck while also applying pressure to it with his hand. He was interrupted by a phone call and got up out bed. BH did as well. After hanging up, he then "picked up" BH, and "threw" her on the bed. Appellant got "on top" of her, grabbed her wrists, and put them above her head. He continued to hold her wrists down with one of his hands for several minutes, until he moved his hands to flip her on top of him.[6] He eventually left the room.

---

[6] Appellant was convicted of one specification of violating Article 128, UCMJ, for unlawful restraint of BH's wrists with his hand. He was acquitted of one specification of violating Article 128, UCMJ, for unlawfully applying force to her neck with his hand, as well as one specification of violating Article 120, UCMJ, for touching her buttocks with his hand, with an intent to gratify his sexual desire, without her consent.

The next day, BH told HC that "something weird" had happened to her. HC asked if it involved Appellant, and BH confirmed it did. Once HC learned that "it" had happened again, she went to her supervisor, who then called the unit's first sergeant, Senior Master Sergeant (SMSgt) JB. SMSgt JB met separately with HC and BH. Appellant was issued a "no contact order" for each of the women.

Two or three days later, on a Sunday morning, at about 0800 on 21 February 2021, Appellant called his first sergeant, the same SMSgt JB, and said words to the effect of, "I need to get ahead of something." Based upon what SMSgt JB heard Appellant say, SMSgt JB told Appellant that, as a first sergeant, he was a mandatory reporter of sexual assault allegations. SMSgt JB called the installation Sexual Assault Response Coordinator and the Air Force Office of Special Investigations (OSI) on-call agent and set up Appellant's appointments with them. Appellant agreed to be evaluated by a sexual assault nurse examiner and agreed to an examination the same day, 21 February 2021.

Appellant explained to the nurse examiner that the night before, he had been a designated driver for "Tilly" (later identified as JM) and her friends earlier in the evening. At the end of the evening, after parking outside his dorm, Appellant noticed JM crying and walking towards her room. He asked her if she wanted to talk, and they went to his room where he offered her "Tylenol and water." They talked for a while, and JM said she was tired and wanted to sleep. After the two of them fell asleep in his bed, JM woke up, undressed herself, and "started making sexual advances" which Appellant said made him feel "uncomfortable." He told JM, "No, I do not want to have sex with you" and that it was a "bad idea." According to Appellant, JM responded that she was "sober," she "kissed" him, and she "started getting on top" of him. "Reluctantly, [they] proceeded to have sex [and e]very time [he] tried to move away[, JM] wrapped her legs around [him]." Appellant stated, "A few times she dug her nails" into him and when they "were done" having sex, JM "got up and had a shower." Appellant explained he gave JM some clothes and they both fell asleep again but when he awoke, "she was gone."

The nurse examiner completed her report and annotated the scratch marks on Appellant's body. She took photographs of the scratches and measured their lengths. Appellant also reported to the nurse examiner that his assailant had performed oral sex on him. The nurse checked "Yes," "Vagina," and "Other" in annotations about whether ejaculation occurred and wrote "[s]he said she did," in the space below the "Other" box. After Appellant's forensic exam he requested a victims' counsel, so he was not immediately interviewed by OSI. Two days later, while still pending a victims' counsel, Appellant informed OSI in writing that he did not intend to participate further into the allegation that JM had sexually assaulted him. After a victims' counsel was detailed to

Appellant, he continued to decline interviews by OSI and provided no additional information to his initial report.

OSI learned of "Tilly's" identity, JM, through AC who was also in Appellant's vehicle the night that Appellant was the designated driver. JM did not go by the name "Tilly." JM had just arrived at RAF Mildenhall, her first duty assignment, on 30 January 2021. OSI interviewed JM first as a subject, consistent with what Appellant told the nurse examiner. After rights advice, JM agreed to answer questions. During her interview as a subject, OSI determined JM may have been a victim instead, and offered her a victims' counsel.

OSI opened two separate investigations, one with Appellant as the victim of JM's sexual assault, and the other with JM as the victim of Appellant's sexual assault. Each investigation had separate lead investigators.

JM explained to OSI she had very little memory of what occurred between her and Appellant on the night in question.[7] While at a party earlier in the evening, she consumed between five and eight "red solo cups" of whiskey mixed with cola and an unknown quantity of "shots." She confirmed Appellant was a designated driver for herself and two others, but she had not previously met him or known him, and she was not a member of Appellant's squadron.

JM explained she was at this party when her friend AC arrived with Appellant and another Airman. AC had coordinated Appellant to be their designated driver after the party. JM noticed Appellant was staring at her during the party, but he did not talk to her. She did not approach him. Instead, she stayed next to her friend AC. After the party, JM and AC were in the backseat of Appellant's vehicle while he drove them to a second party; they were kissing each other.

At the end of the evening, JM recalled walking past Appellant's room on the way to her own, when Appellant called out to her, "[C]ome here." He "ushered" her into his room and told her to sit on his bed. She remembered that Appellant talked to her about how "kissing [AC] was not the type of person [she] was," and JM remembered getting upset because she felt like Appellant was telling her who she was as a person. Appellant told her to "calm down, lay over, and just go to sleep." Appellant pushed her onto her left side. She laid her head down and fell asleep. Later, she woke up in the same position but wearing his sweatshirt with the hood drawn over her hair and tied under her chin. Her hair was "completely soaked" and she was otherwise naked. She was scared. She saw her phone in front of her. She used it to look behind her. She saw

---

[7] At trial, JM maintained she had no memory of Appellant and her having sex on the night in issue.

Appellant. While she had taken a video of him laying behind her, she panicked and immediately deleted it because she did not want him to see it. She took "a few videos" of just herself while she laid there.

JM got up to leave the bed, and Appellant grabbed her arm at the elbow. She told him she was just getting up to go to the bathroom. She went to Appellant's bathroom and locked the door. She recalled having a tampon in her vagina the night before, so she "checked to see if it was still there, and it was pushed very, very far up inside of [her]." She pulled it out and flushed it down the toilet. After leaving the bathroom, she noticed the bedroom was "destroyed." Her "clothes were everywhere, all over the floor." The desk chair he had been sitting on "was broken;" the seat of the chair was "broken down." She grabbed her things, put some clothes on, and left. She took both her room key and Appellant's because she could not tell which one was hers. She did go back to retrieve her watch, but Appellant was still asleep.

AC explained that after they left the first party, they stopped at a house where JM had left her identification card. While waiting on JM inside the car, Appellant told AC to stop making out with JM because Appellant was "trying to get at her" or "at that." After everyone was back in the vehicle, Appellant volunteered to stop and get them more alcohol. They also stopped to get food. Upon arrival to base, they went to another dorm room for the second party and drank the additional alcohol, a bottle of gin mixed with juice. Appellant still did not drink. Appellant drove JM and AC back to their dorm parking lot. When they got out of the vehicle, JM left for her room, and AC left for hers. AC thought Appellant went to his room by himself.

The next morning, AC received a text from Appellant asking her to help him get his room key back from JM. AC became concerned, went to Appellant's room, and asked Appellant why JM would have his room key. At that time, Appellant was on the phone with SMSgt JB, and AC left.

Appellant's commander, Lieutenant Colonel (Lt Col) JS, preferred the following offenses against Appellant: one specification of assault consummated by a battery of HC; two specifications of assault consummated by a battery of BH; one specification of abusive sexual contact of HC; one specification of abusive sexual contact of BH; one specification of sexual assault of JM; and one specification of making a false official statement to SMSgt JB on 19 May 2021. A preliminary hearing occurred on 24 June 2021. On 7 July 2021, the staff judge advocate to the special court-martial convening authority (SPCMCA/SJA), Lt Col SM, "identified a potential unlawful command influence issue whereby [Lt Col JS] potentially felt pressure to prefer charges against [Appellant]" and recommended dismissal of the charges. A superior competent authority, Colonel (Col) JH, directed these charges and

7

specifications dismissed without prejudice the same day on 7 July 2021. On 4 August 2021, the same charges and specifications were preferred against Appellant by Major (Maj) TB—a commander other than Appellant's commander. On 12 August 2021, the staff judge advocate to the general court-martial convening authority (GCMCA/SJA) recommended the charges be referred to a general court-martial (GCM); the GCMCA did refer the charges to a GCM on the same day.

## II. DISCUSSION

### A. Selective Prosecution

At trial and on appeal, Appellant asserts he was selectively prosecuted because of his gender. As a remedy, Appellant requests the court set aside his convictions and sentence. We decline to do so on this basis.

#### 1. Additional Background

After OSI completed its investigation into Appellant's allegations that JM sexually assaulted him, JM's squadron commander, Maj AH, determined that a court-martial was an inappropriate disposition. Maj AH personally reviewed the OSI case file and received advice from the SPCMCA legal office. The SPCMCA/SJA recommended, in writing on 13 July 2021, an initial disposition of "No action" and forwarded the case to the SPCMCA. The SPCMCA also determined a court-martial was inappropriate, informed the GCMCA the same day, and returned the case to the squadron commander—Maj AH. On 23 July 2021, the GCMCA acknowledged the initial disposition of the allegation against JM, and specifically mentioned Appellant's decision not to participate in the investigation or court-martial.

On 4 March 2021, Appellant's commander, Lt Col JS, ordered Appellant into pretrial confinement. In an email the next day to her supervisory command chain, she summarized her rationale behind that decision. In part, she wrote, "[I]f [Appellant] has the opportunity to get his story out of 'I (white male) was the victim first, now the black female is the victim,' there could be backlash."

At trial, the Defense moved to dismiss Specification 3 of Charge II (sexual assault of JM) and the Specification of Charge III and Charge III (false official statement) due to selective prosecution in violation of the Fifth Amendment[8] of the United States Constitution, and R.C.M. 905(b)(2). The Government opposed the motion. During her testimony on this motion, Lt Col JS explained this line in the email was meant to inform her leadership of the potential

---

[8] U.S. CONST. amend. V.

ramifications if Appellant took his alleged version of events to social media. She denied that she had ordered Appellant into pretrial confinement to prevent him from communicating his accusations.

The trial judge issued a written ruling, denying the defense motion. The trial judge reasoned Appellant and JM were not similarly situated. First, JM was highly intoxicated; Appellant was sober. Appellant knew JM was highly intoxicated as evidenced by his statement to the nurse examiner that he gave her Tylenol and water. Second, Appellant's initial report indicating he was sexually assaulted came after he had just been given two no-contact orders for two other individuals who had complaints against him. He was aware of this when he told SMSgt JB that "he needed to get ahead of something." The convening authority would have had all the investigative information, including what amounted to cross-complaints. Third, Appellant did not participate in the investigation into his allegation, whereas JM did participate. Fourth, the Government completed all the substantive steps of processing the decision to take no action against JM, while at the same time, simultaneously completed the substantive steps to prosecute Appellant.

The trial judge also reasoned that the Government's prosecution of Appellant was not invidious, in bad faith, or because of his gender. First, despite Appellant's argument that OSI was essentially biased in treating JM as the victim instead of the subject, OSI did not make the charging decisions. Second, Appellant's commander, who wrote the sentence "if [Appellant] has the opportunity to get his story out of 'I (white male) was the victim first, now the black female is the victim,' there could be backlash" did not prefer the charges that were ultimately referred to trial. Lt Col JS stated that the sentence did not reflect her perspective on the crimes, only that the command chain should be aware of a potential public affairs issue should Appellant voice his allegations of disparate treatment via social media. Finally, Appellant's argument of government vindictiveness is not borne out by the evidence. The trial judge determined Appellant had not met his "heavy burden" and had failed to show "clear evidence" that the convening authority improperly performed his duties in this case.

### 2. Law

We review the trial judge's ruling for an abuse of discretion. *United States v. Gargaro*, 45 M.J. 99, 102 (C.A.A.F. 1996). "The burden of persuasion on a claim of selective prosecution is on the moving party." *United States v. Argo*, 46 M.J. 454, 463 (C.A.A.F. 1997); *see* R.C.M. 905(c)(2)(A).

> To support a claim of selective or vindictive prosecution, an accused has a "heavy burden" of showing that "others similarly situated" have not been charged, that "he has been singled out for

prosecution," and that his "selection . . . for prosecution" was "invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights."

*Argo*, 46 M.J. at 463 (quoting *United States v. Garwood*, 20 M.J. 148, 154 (C.M.A. 1985)). Appellant bears the burden to rebut the presumption that prosecutorial authorities and convening authorities act without improper bias. *Id.*

### 3. Analysis

On appeal, Appellant maintains he was the victim of sexual assault. Further, Appellant claims he was prosecuted as the offender due to the impermissible reason of his gender despite his allegations that JM was the aggressor. We find the trial judge did not abuse his discretion.

Appellant's claim rests on argument and not evidence. He asserts OSI determined that "a man could not be a victim of sexual assault." To back his claim, Appellant cites an article about male-victim rape. Appellant's claim fails, however, for a lack of evidence about the "selective or vindictive" determinations made in this case. *Id.*

The record reflects there were two investigations, conducted by two separate lead investigators, into the events of one night involving the same people. The investigators wrote separate reports. After analyzing the evidence, neither JM's commander nor any superior competent authority preferred charges against her. However, after analyzing the evidence, a squadron commander levied charges of penetrative sexual assault and a false official statement against Appellant for his conduct related to JM.

Two separate commanders made the initial disposition recommendation of no action for the allegation against JM; and two commanders made the second initial disposition recommendation in favor of prosecution for the allegations against Appellant. The commander who preferred these charges against Appellant was not the commander who wrote the line in the email that concerned Appellant. Both JM and Appellant were subordinates to the same GCMCA; however, we see no evidence in the record that indicates the GCMCA prosecuted Appellant due to his gender.

We find the trial judge's findings of fact to be consistent with the evidence presented to him and his conclusions of law were not in error. Appellant has not met his heavy burden. *Argo*, 46 M.J. at 463. He has not presented persuasive evidence of prosecution due to his gender. Therefore, we do not find that the trial judge abused his discretion in deciding to deny Appellant's motion for selective prosecution.

**B. UCI[9] Taint Overcome**

**1. Additional Background**

Appellant's squadron commander, Lt Col JS, initially decided she would initiate discharge action against Appellant after first offering him an opportunity to respond to a Letter of Reprimand (LOR). After serving the LOR, she instead preferred charges. She testified during the preliminary hearing that she felt forced to prefer charges. Those charges were dismissed and preferred anew by a second commander, after he reviewed the evidence and believed the allegations warranted preferral. After the second preferral of the same charges, the case progressed through all phases to trial. On appeal, Appellant asserts the errors from the first preferral were not overcome by the second preferral. We disagree.

At trial, the Defense filed a timely motion requesting the trial judge dismiss all charges with prejudice for UCI occurring in five different parts of this court-martial which the Defense identified as:

> (1) actual UCI in the initial preferral stage of the court[-]martial; (2) actual UCI . . . in the preferral stage of the second preferred charges of this court-martial; (3) actual UCI in the member selection phase as the panel was improperly stacked at the direction of the [GCMCA] or his agents; (4) apparent UCI in the accusatory stage . . . ; and (5) apparent UCI in the member selection phase . . . .

The Government opposed the motion.

The trial judge held a pretrial hearing pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a). The Government conceded the initial preferral—part (1)—amounted to UCI but argued the UCI was remedied by re-preferral. In a written ruling, denying the motion, the trial judge found that at the time of the original preferral "the charges were legally ineffective and had to be treated as unsigned and unsworn." He continued, "Even if the court agrees with the parties that the totality of the circumstances surrounding the interference with the issued LOR and Lt Col [JS]'s preferral of the charges resulted in . . . actual UCI . . . it was cured when the problematic charges and specifications were dismissed without prejudice."

---

[9] The current title of Article 37, UCMJ, 10 U.S.C. § 837, is *Command influence*; however, we use Unlawful Command Influence (UCI) for consistency with parlance in Appellant's brief.

Prior to preferring charges, Appellant's commander, Lt Col JS, discussed the disposition of Appellant's offenses against HC and BH with the SPCMCA legal office. Lt Col JS intended to dispose of the offenses with administrative action followed by Appellant's administrative discharge. She understood that the SPCMCA legal office was recommending disposition with no action with respect to the offense against JM. On 15 April 2021, Lt Col JS served Appellant with a LOR addressing HC's and BH's allegations, for which Appellant receipted the same day.

On 20 April 2021, the Chief of Military Justice for the GCMCA (GCMCA/CMJ), Maj NR, emailed the SPCMCA legal office stating,

> I just wanted to see if we can pump the brakes on [Appellant's] case . . . based on my review of the evidence, I feel weird about the idea of him getting an LOR for what is a pretty decent case, and just wanted to see if you can talk me through it. . . . Based on the clear picture of him as a narcissistic predator, his transparent attempts at obstruction of justice, and the 0% chance he's discharged if you give him an LOR (Defense will have a field day with that), I think we need to think through options here . . . maybe we arrive at the same [course of action], but I just need to know why.

(First and third ellipses in original).

Lt Col JS was informed of this email and felt influenced, so she stopped processing the LOR. Instead, on 19 May 2021, Lt Col JS preferred charges against Appellant. The charges preferred were three specifications alleging violations of Article 128, UCMJ; three specifications alleging violations of Article 120, UCMJ; and one specification alleging a violation of Article 107, UCMJ. On 24 June 2021, the charges were investigated by a preliminary hearing officer (PHO) pursuant to Article 32, UCMJ, 10 U.S.C. § 832. During the preliminary hearing, Lt Col JS testified she felt pressured to prefer these charges against Appellant. She explained she believed the GCMCA "wanted her to send the case to a [court-martial]."

On 2 July 2021, the PHO found probable cause existed to refer all charges and recommended referral to a general court-martial.

Instead of referral, on 7 July 2021 the SPCMCA/SJA sent an email to the acting SPCMCA with an attachment ready for signature recommending dismissal of all charges without prejudice. In a previous email, she assumed responsibility by explaining some confusion arose because of inartful advice from her office to Lt Col JS. To the acting SPCMCA, she wrote,

> First, we have identified a potential unlawful command influence issue whereby the [s]quadron [c]ommander potentially felt pressured to prefer charges against the member. Dismissal ends the current case proceedings, and will allow a neutral commander to review the evidence and make a disposition decision. Secondly, a dismissal permits the member to [permanently change stations] to RAF Lakenheath.[10] This will ensure there are not future run ins between [Appellant] and the alleged victims in his case. It will also ensure that [Appellant] has better access to the resources needed for his [v]ictim case.

(Footnote omitted).

The charges were withdrawn and dismissed on 7 July 2021. On 15 July 2021, Appellant's defense counsel discussed alternate disposition of the offenses with the SPCMCA legal office, who, in turn, explored the idea with the GCMCA legal office. The GCMCA/SJA responded via email,

> Nope. [Appellant] is a serial abuser of women who[m] he targeted because he believed due to their personal circumstance and/or level of intoxication they would not report him and then he decided to brand one of his victims, who he knew was so drunk she probably would not be in a good place to deny it, as a sexual offender herself. I cannot in good conscious [sic] recommend letting him off without accountability, acknowledgement of his actions, and an appropriate black mark that will stay with him long into the future branding HIM the sexual offender – that's court-martial. Feel free to pass along these sentiments to whoever [sic] needs to hear them (victims included).

The SPCMCA/SJA had called Maj TB, a different RAF Mildenhall squadron commander, and "asked him to look at a case and see if it should go to trial." Although Maj TB recalled the SPCMCA/SJA mentioning the numbered Air Force, he had no specific memory of the details. The SPCMCA/SJA did not provide procedural history on the case or any specific details about the case. Maj TB reviewed the evidence and received legal advice with a recommendation from the SPCMCA legal office. Maj TB did not feel pressure to make any particular decision on the case but did inform the SPCMCA legal office he believed the case should go to trial.

On 4 August 2021, Maj TB preferred the same charges previously preferred and investigated. On 6 August 2021, the charges were forwarded, using the

---

[10] Appellant ultimately did not change duty stations.

previously conducted Article 32, UCMJ, hearing investigation and report. These charges were referred to trial by the GCMCA on 12 August 2021.

### 2. Law

An appellate court "reviews allegations of unlawful command influence, including allegations of the appearance of unlawful command influence, de novo." *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021) (citations omitted). "We accept as true the [trial] judge's findings of fact on a motion to dismiss for unlawful command influence unless those findings are clearly erroneous." *Id.* (citation omitted).

Unlawful command influence (UCI) is prohibited by Article 37, UCMJ, 10 U.S.C. § 837.[11] Persons subject to the UCMJ, outside of command, are also prohibited from unlawful influence.

> No person subject to this chapter may attempt to coerce or, by any unauthorized means, attempt to influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority or preliminary hearing officer with respect to such acts taken pursuant to this chapter as prescribed by the President.

Article 37(a)(3), UCMJ, 10 U.S.C. § 837(a)(3).

> No superior convening authority or officer may direct a subordinate convening authority or officer to make a particular disposition in a specific case or otherwise substitute the discretion of such authority or such officer for that of the subordinate convening authority or officer.

Article 37(a)(5)(B), UCMJ, 10 U.S.C. § 837(a)(5)(B).

However, superior convening authorities or officers may generally discuss matters to consider regarding disposition of alleged violations of the UCMJ with subordinate convening authorities or officers, and subordinate convening authorities or officers may seek advice from superior convening authorities or officers regarding the same. *See* Article 37(a)(5)(A)(i) and (ii), UCMJ, 10 U.S.C. § 837(a)(5)(A)(i), (ii).

---

[11] References to Article 37, UCMJ, are to the version in effect with respect to allegations of UCI committed on or after 20 December 2019, following the enactment of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 532, 133 Stat. 1198 (20 Dec. 2019).

Article 37(c), UCMJ, provides as follows: "No finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section unless the violation *materially prejudices the substantial rights of the accused*." 10 U.S.C. § 837(c) (emphasis added).

According to our superior court's caselaw analyzing the previous version of Article 37, UCMJ, at trial, "[t]wo types of unlawful command influence c[ould] arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful command influence." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017).

Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id.* (citations omitted). In order to demonstrate actual UCI, an appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citation omitted). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citation omitted).

Apparent UCI is found where "unlawful command influence placed an 'intolerable strain' on the public's perception of the military justice system," raising "significant doubt" the proceeding was fair. *Boyce*, 76 M.J. at 249 (citation omitted). Previously, prejudice to Appellant was not "required for a meritorious claim of an appearance of unlawful command influence" because the standard was objective. *Boyce*, 76 M.J. at 248 (footnote omitted). However, this court is now limited in its ability to grant relief for apparent UCI without Appellant's demonstration of material prejudice, even if found at trial. *In re Vargas*, 84 M.J. 734, 740–41 (A.F. Ct. Crim. App. 2024) (citations omitted); *see also United States v. Burnett*, No. ACM 39999, 2022 CCA LEXIS 342, at *58 (A.F. Ct. Crim. App. 10 Jun. 2022) (unpub. op.) (stating to succeed on a claim of UCI, an appellant is "required to demonstrate material prejudice").

For both actual and apparent UCI,

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the [G]overnment to rebut an allegation of unlawful command influence by persuading the [c]ourt beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

*Salyer*, 72 M.J. at 423 (citing *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)).

The United States Court of Appeals for the Armed Forces (CAAF) "has long recognized that Article 37(a)[, UCMJ,] prohibits unlawful influence by all persons subject to the UCMJ." *United States v. Barry*, 78 M.J. 70, 76 (C.A.A.F. 2018) (emphasis omitted) (citing *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004)). A claim of unlawful influence from a non-command source is evaluated by application of the same test that is used to evaluate "abuses perpetrated by those in command or those acting with the mantle of command authority." *Id.* at 76–77.

While the term "unlawful command influence" has been used broadly in military jurisprudence "to cover a multitude of situations," the CAAF "has sought to draw a distinction between the accusatorial process and the adjudicative stage." *United States v. Weasler*, 43 M.J. 15, 17 (C.A.A.F. 1995) (footnotes omitted). The difference between the two is the former covers the processes involved in bringing a case to court-martial (*e.g.*, preferral, forwarding and referral of charges), while the latter involves the trial process, "including interference with witnesses, judges, members, and counsel." *Id.* at 17–18 (footnotes omitted). "As to the accusatory stages, we have held that an accuser may not refer a case to trial and that a commander may not be coerced into preferring charges." *Id.* at 19 (citation omitted).

Even though an SJA is neither a commander nor a convening authority, the CAAF has held that "actions by an SJA may constitute unlawful command influence, because 'a staff judge advocate generally acts with the mantle of command authority.'" *United States v. Hamilton*, 41 M.J. 32, 37 (C.A.A.F. 1994) (quoting *United States v. Kitts*, 23 M.J. 105, 108 (C.M.A. 1986)). The court continued,

> We do not believe, however, that every instance of advice or expression of opinion by an SJA is attributed to his or her commander. We also do not believe that SJAs must be timid in expressing their views. SJAs frequently are asked for legal advice by subordinate commanders, and they are obliged to provide competent and candid advice. It is incumbent upon SJAs, however, to make it clear when they are expressing the view of their commanders and when they are expressing their own legal opinions.

*Id.*

### 3. Analysis

Appellant asserts the actual UCI taint was not overcome due to the GCMCA/SJA's consistent involvement in steering the case through trial. Appellant submits the trial judge erred when he concluded that any taint from the UCI that occurred was overcome when: (1) the GCMCA legal office

influenced the SPCMCA legal office to change its opinion on the case twice; (2) the SPCMCA legal office told the base leadership about the UCI; and (3) the SPCMCA legal office then advised base leadership pursuant to the GCMCA legal office's influence. Without specifying exactly who is responsible for the failure to overcome the actual UCI taint in his case, Appellant casts a wide net including the second accuser, the command chain, the SPCMCA legal office, the GCMCA legal office, and the referring GCMCA. The primary evidence of this alleged taint comes from emails between the SPCMCA/SJA and the base leadership, as well as from the GCMCA/SJA and the GCMCA chief of military justice (GCMCA/CMJ) to the SPCMCA legal office.

Rather than correcting the original actual UCI through another squadron commander, as was done in this case, Appellant offers the UCI taint could have only been overcome through one of three ways: (1) "return [the case] to the status quo" after dismissal of the original charges (administrative action and discharge), (2) give Appellant's case to a new "base" and new convening authority, or (3) manage the second preferral, referral, and trial by the GCMCA legal office alone. Interestingly, despite the allegation that the GCMCA/SJA and GCMCA/CMJ were implicated in the taint of actual UCI, Appellant does not offer as a potential remedy a new SJA or CMJ at the GCMCA level. On appeal, Appellant requests the court set aside the findings and sentence. We decline to do so on this basis.

Without specifying who (command, non-command, at which level) committed which type of UCI (actual or apparent, or both), in which stage (accusatory or adjudicative), Appellant fails to cite current statutory guidance or well explain how that statutory guidance, along with relevant precedent, applies in his case on appeal. Nonetheless, we understand Appellant is renewing the claims he articulated at trial, with an emphasis on the role of the GCMCA legal office, primarily the SJA and the CMJ, in processing the offenses after the charges were preferred for the second time in his case. In other words, we understand Appellant raises on appeal actual unlawful command influence by non-commanders, during the accusatory stage. We find Appellant has not satisfied his burden to establish some evidence thereof. The trial judge's findings of fact are consistent with the evidence presented and are not clearly erroneous.

The trial judge found the first preferral was "legally ineffective" because of the squadron commander's perception that she had to prefer the original charges. The withdrawal and dismissal, then determination by a separate accuser, resulting in a second preferral in this case, remedied the challenges with the first. The second preferral was without unlawful influence. The second squadron commander did not feel pressure to prefer, but instead,

independently determined the charges warranted going to trial and preferred them accordingly.

The trial judge found no actual or apparent unlawful command influence with the second preferral of charges, or any other portion of the accusatorial stage. We agree. The legal advice in this case during the disposition discussions was candid and clear. The legal advice was specific to the lawyers advising on the case and well communicated their intended advice to the convening authority. Although word choices were firm, and at certain places unhelpful, they were non-directive in nature, and did not implicate the intentions of the SPCMCA or GCMCA. Finally, Appellant has not raised evidence of material prejudice, and we find none.

## C. R.C.M. 707 Speedy Trial Claim

At trial and on appeal, Appellant advocates the dismissal of his charges from the first preferral did not stop his speedy trial clock under R.C.M. 707 because the Government's re-preferral of charges was solely in response to evidence of unlawful command influence and amounted to "subterfuge" or an "improper reason." *See United States v. Hendrix*, 77 M.J. 454, 456–57 (C.A.A.F. 2018) (citation omitted). As a result, Appellant requests we set aside his convictions and sentence. We decline to do so on this basis.

At trial, the Defense made a timely motion for various alleged speedy trial violations. After carefully considering all bases, the trial judge denied the motion. The trial judge made extensive findings of fact and well analyzed his conclusions of law. As it relates to this issue of whether the Government dismissed the original charges due to subterfuge or an improper reason, and thereby violated Appellant's R.C.M. 707 speedy trial rights, the trial judge determined the charges were dismissed to avoid a potential UCI issue. We agree with the trial judge and find the dismissal was not due to subterfuge or an improper reason.

### 1. Law

"Whether an appellant received a speedy trial is a question we review de novo." *United States v. Fujiwara*, 64 M.J. 695, 697 (A.F. Ct. Crim. App. 2007) (citations omitted). "We give substantial deference to findings of fact made by the military judge and will not overturn such findings unless they are clearly erroneous." *Id.* (citations omitted). A military accused may seek relief for alleged speedy trial violations under R.C.M. 707. *See United States v. Tippit*, 65 M.J. 69, 73 (C.A.A.F. 2007); *Fujiwara*, 64 M.J. at 697.

"The accused shall be brought to trial within 120 days . . . [of p]referral of charges." R.C.M. 707(a)(1). For purposes of R.C.M. 707, an "accused is brought to trial . . . at the time of arraignment." R.C.M. 707(b)(1). If charges are dismissed and then re-preferred, a new 120-day period begins from the date of re-

preferral. R.C.M. 707(b)(3)(A)(ii)(I); *Hendrix*, 77 M.J. at 456. "If charges are merely withdrawn and not subsequently dismissed, however, the R.C.M. 707 'speedy-trial clock continues to run.'" *United States v. Leahr*, 73 M.J. 364, 367 (C.A.A.F. 2014) (quoting *United States v. Britton*, 26 M.J. 24, 26 (C.M.A. 1988)). "Absent a situation where a convening authority's express dismissal is either a subterfuge to vitiate an accused's speedy trial rights, or for some other improper reason, a clear intent to dismiss will be given effect." *Id.* at 369 (citations omitted); *see also* R.C.M. 707(b)(3)(A)(iii) ("In a case in which it is determined that charges were dismissed for an improper purpose or for subterfuge, the time period determined under subsection (a) shall continue to run."). In *Leahr*, the CAAF defined a proper reason to be "a legitimate command reason which does not 'unfairly prejudice' an accused." 73 M.J. at 369 (citation omitted).

### 2. Analysis

Here, Lt Col JS preferred the original charges because she felt pressure to do so. The charges were withdrawn and dismissed as a result. The evidence was reviewed anew by a different accuser, who, without knowledge of the procedural history of the case, informed the SPCMCA legal office he believed the case warranted court-martial. As a result, he preferred the same charges. The case was forwarded and referred. The goal of curing any actual UCI was accomplished. Appellant has not raised any evidence of subterfuge or an improper purpose and after reviewing the record, we find none.

Therefore, with only 62 days passing between preferral and arraignment on Appellant's charges, there is no R.C.M. 707 speedy trial violation. Although not specifically raised by Appellant on appeal, we also considered the effects of Appellant's restrictions at the time the original charges were dismissed. *See generally* R.C.M. 707(a)(2) (citing restraint under R.C.M. 304(a)(2)–(4)). We do not believe these restrictions were tantamount to confinement, but even if they were, the difference would be an additional 28 days, for a total of 90 days. Thus, even under this more generous application, there is no R.C.M. 707 speedy trial violation here either.

### D. Legal and Factual Sufficiency of Convictions

Contrary to his pleas, Appellant was found guilty of one specification of sexual assault and one specification of abusive sexual contact in violation of Article 120, UCMJ; one specification of assault consummated by a battery in violation of Article 128, UCMJ; and one specification of false official statement in violation of Article 107, UCMJ.

On appeal, Appellant argues his convictions are legally and factually insufficient, and accordingly, that we should set aside Appellant's convictions and sentence. Specific to factual sufficiency, Appellant avers the Government's case was deficient in that they "failed to prove": (1) he unlawfully restrained the

wrists of BH; (2) he touched HC's buttocks with an intent to gratify his sexual desire, or that it was without her consent; (3) he penetrated JM without her consent; or (4) he told SMSgt JB he was "sexually assaulted." We disagree with contentions (1), (2), and (4). We agree with contention (3).

### 1. Law

#### a. Standards of Review

We review questions of legal sufficiency de novo. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019). We review questions of factual sufficiency when an appellant asserts an assignment of error and shows a specific deficiency in proof. *United States v. Harvey*, ___ M.J.___, No. 23-0239, 2024 CAAF LEXIS 502, at *5 (C.A.A.F. 6 Sep. 2024) (citing Article 66(d)(1)(B)(ii)(I), UCMJ).

#### b. Tests for Legal and Factual Sufficiency

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

Article 66(d)(1), UCMJ, provides:

(B) FACTUAL SUFFICIENCY REVIEW.

(i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.

(ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

(I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*). The factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* The National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (1 Jan. 2021).

The requirement of "appropriate deference" when a CCA weighs the evidence and determines controverted questions of fact "depend[s] on the nature of the evidence at issue." *Harvey*, 2024 CAAF LEXIS 502, at *8. This court has discretion to determine what level of deference is appropriate. *Id.* "[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at *10 (internal quotation marks omitted). In order for this court "to be clearly convinced that the finding of guilty was against the weight of the evidence, two requirements must be met." *Id.* at *12. "First, [we] must decide that the evidence, as [we] weighed it, does not prove that the appellant is guilty beyond a reasonable doubt. Second, [we] must be clearly convinced of the correctness of this decision." *Id.* (emphasis omitted). "[T]he factfinder at the trial level is always in the best position to determine the credibility of a witness." *United States v. Peterson*, 48 M.J. 81, 83 (C.A.A.F. 1998).

### c. Offenses

In order to convict Appellant of assault consummated by a battery of BH as charged in this case, the Government was required to prove that at or near RAF Mildenhall on or about 11 February 2021: (1) Appellant did bodily harm to BH (restrain her wrists with his hand); (2) the bodily harm was done unlawfully; and (3) that the bodily harm was done with force or violence. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 77.b.(2). The term

"'bodily harm' means an offensive touching of another, however slight." *MCM*, pt. IV, ¶ 77.c.(1)(a). An "assault" is unlawful when it is without legal justification or excuse and without the lawful consent of the person affected. *MCM*, pt. IV, ¶ 77.c.(2)(a). A "battery" is an assault in which the bodily harm is consummated by the infliction of that harm. *MCM*, pt. IV, ¶ 77.c.(3)(a).

In order to convict Appellant of abusive sexual contact of HC as charged in this case, the Government was required to prove that at or near RAF Mildenhall on or about 9 January 2021: (1) Appellant committed sexual contact upon HC (touch her buttocks with his hand) with an intent to gratify his own sexual desire; and (2) the sexual contact was without her consent. *See* 10 U.S.C. § 920(d); *MCM*, pt. IV, ¶ 60.a.(d). "The term 'sexual contact' means touching . . . either directly or through the clothing, the . . . buttocks of any person, with the intent to . . . gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 60.a.(g)(2). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A).

In order to convict Appellant of sexual assault of JM as charged in this case, the Government was required to prove that at or near RAF Mildenhall on or about 19 February 2021: (1) Appellant committed a sexual act upon JM by penetrating her vulva with his penis; and (2) the sexual act was without her consent. *See* 10 U.S.C. § 920(b)(2)(A); *MCM*, pt. IV, ¶ 60.a.(b)(2)(A). "The term 'sexual act' means the penetration, however slight, of the penis into the vulva . . . ." *MCM*, pt. IV, ¶ 60.a.(g)(1)(A). However, our superior court recently held that when charging under this theory, the Government must prove the victim was capable of consenting but did not consent. *United States v. Mendoza*, __ M.J. __, No. 23-0210, 2024 CAAF LEXIS 590, at *13 (C.A.A.F. 7 Oct. 2024).

A charge of sexual assault without consent is a separate theory of liability from a charge of sexual assault upon a person incapable of consenting. *Id*. at *17. Sexual assault without consent charges allege criminal conduct "upon a victim who is capable of consenting but does not consent." *Id*. Charges of sexual assault upon a person incapable of consenting allege criminal conduct "upon a victim who is incapable of consenting to the sexual act due to impairment by any drug, intoxicant, or other similar substance when the victim's condition is known or reasonably should be known by the accused." *Id*. at *18.

In cases where sexual assault is charged as without consent, evidence of a victim's level of intoxication may be relevant and admissible. *Id*. at *22. However, it is improper to use this evidence "as proof of [a victim's] inability to consent and therefore proof of the absence of consent" in these cases. *Id*. In other words, what "the Government cannot do is prove the absence of consent [in 'without consent' cases] under Article 120(b)(2)(A), UCMJ, by merely establishing that the victim was too intoxicated to consent." *Id*.

Findings of guilty may be based on direct or circumstantial evidence. *Id*. at *10–11 (citing R.C.M. 918(c)). "The absence of direct evidence of an element of an offense does not prevent a finding of guilty for that offense from being legally sufficient." *Id*. at *11.

In order to convict Appellant of making a false official statement to SMSgt JB as charged in this case, the Government was required to prove that at or near RAF Mildenhall, on or about 21 February 2021, Appellant made a false official statement, knowing it to be false and with intent to deceive, to wit: that he was sexually assaulted by JM, or words to that effect. *See* 10 U.S.C. § 907(a); *MCM*, pt. IV, ¶ 41.b.(1). "Statements may be made orally or in writing and include records, returns, regulations, orders, or other documents." *MCM*, pt. IV, ¶ 41.c.(1)(a).

> Official statements are those that affect military functions, which encompass matters within the jurisdiction of the military departments and Services. There are three broad categories . . . [including] where [Appellant] . . . makes a statement to a military member who is carrying out a military duty at the time the statement is made.

*MCM*, pt. IV, ¶ 41.c.(1)(b)(ii). The false representation must be made with the intent to deceive. *MCM*, pt. IV, ¶ 41.c.(1)(d).

### 2. Analysis

#### a. Assault Consummated by a Battery

Viewing the evidence in the light most favorable to the Government, the panel members rationally found Appellant guilty of assault consummated by a battery against BH beyond a reasonable doubt. Therefore, the findings of guilty as to Specification 2 of Charge I, and to Charge I, are legally sufficient. *See Robinson*, 77 M.J. at 297–98.

Regarding the factual sufficiency of the same conviction, Appellant has made a request for a factual sufficiency review and has asserted a showing of a deficiency of proof in that the Government "failed to prove" he unlawfully restrained the wrists of BH. We have considered whether Appellant's claims are specific enough to trigger further analysis. We assume here, without deciding, Appellant's claim of deficiency is sufficiently specific for our analysis.

We find Appellant's conviction for assault consummated by a battery against BH factually sufficient. BH testified that on 11 February 2021 on her dorm room bed, Appellant got on top of BH and grabbed her wrists and put them above her head. He continued to hold her wrists down with one of his hands. She testified that his conduct was offensive, with force, and without her consent.

After weighing all the evidence and having given appropriate deference to the fact that the trial court saw and heard the witnesses, this court does not conclude that the findings of guilty were against the weight of the evidence as to Specification 2 of Charge I, and to Charge I. Thus, those findings of guilty are factually sufficient. *See* Article 66(d)(1)(B)(i)–(ii), UCMJ (2024 *MCM*).

### b. Abusive Sexual Contact

Viewing the evidence in the light most favorable to the Government, the panel members rationally found Appellant guilty of abusive sexual contact of HC beyond a reasonable doubt. Therefore, the findings of guilty as to Specification 1 of Charge II, and to Charge II are legally sufficient. *See Robinson*, 77 M.J. at 297–98.

Regarding the factual sufficiency of the same conviction, Appellant has made a request for a factual sufficiency review and has asserted a showing of a deficiency of proof in that the Government "failed to prove" he touched HC's buttocks with an intent to gratify his sexual desire, or that it was without her consent. We have considered whether Appellant's claims are specific enough to trigger further analysis. We assume here, without deciding, Appellant's claim of deficiency is sufficiently specific for our analysis.

We find Appellant's conviction for abusive sexual contact of HC factually sufficient. HC testified that on 9 January 2021, in the evening hours, Appellant randomly showed up at HC's dorm room on RAF Mildenhall and began pounding on her door. After letting him into her room, Appellant "started leaning in" so HC put her hands on his mouth. He said, "[N]o, I was just going to go in for a hug," and he put his arms around her waist. After telling Appellant he had to leave, he took his hands, ran them down her body and tried to lift her up. When he did this, his fingers were at the bottom of her buttocks. HC grabbed his hands to stop him from going further. At that point, Appellant backed up and kissed her forehead multiple times. HC testified that Appellant's contact was on her buttocks and without her consent. We infer from the series of Appellant's actions, that he had the intent to satisfy his sexual gratification.

After weighing all the evidence and having given appropriate deference to the fact that the trial court saw and heard the witnesses, this court does not conclude that the findings of guilty were against the weight of the evidence as to Specification 1 of Charge II, and to Charge II. Thus, those findings of guilty are factually sufficient. *See* Article 66(d)(1)(B)(i)–(ii), UCMJ, (2024 *MCM*).

### c. Sexual Assault

We have contemplated whether Appellant's conviction for sexual assault of JM is legally sufficient considering *Mendoza*, viewing the evidence in the light most favorable to the Government. We considered the facts and circumstances

surrounding this conviction and have determined we need not address legal sufficiency. *See Robinson*, 77 M.J. at 297–98.

Regarding the factual sufficiency of the same conviction, Appellant has made a request for a factual sufficiency review and has asserted a showing of deficiency, submitting the Government failed to prove he penetrated JM without her consent. Appellant's claim of deficiency is sufficiently specific for our analysis.

Appellant explained to the trained sexual assault nurse examiner that he had had sexual intercourse with JM, reluctantly, after she initiated sexual relations with him. JM testified she had very little memory of what occurred between her and Appellant on 19 February 2021. At one party, she consumed between five and eight "red solo cups" of whiskey mixed with cola and an unknown quantity of "shots." At a second party, AC testified that everyone, but Appellant, drank more alcohol. This time it was a shared bottle of gin mixed with juice. JM did not explain whether this alcohol consumption caused her capacity to consent to be affected. There was no expert testimony offered at trial regarding what effect, if any, this alcohol had on JM.

JM confirmed Appellant was a designated driver for herself and two others, but she had not previously met him or known him. Indeed, she recalled being upset with him in his dorm room, after he told her that she should not have been kissing AC, as that was not who she was as a person. Nonetheless, she felt tired, and fell asleep on Appellant's bed. She woke up next to him, naked from the waist down, but had no memory of sexual relations with Appellant.

The Government charged this offense as "without consent," a violation of Article 120(b)(2)(A), UCMJ. JM did not testify she consented to the penetration of her vulva by Appellant's penis as she did not make a "freely given agreement" to the sexual intercourse. *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). However, whether she had the capacity to consent as a "competent person" is not in the record before us. *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). Although Appellant provided a statement to the nurse examiner that JM had initiated sexual intercourse with him, this statement is inconsistent with the remainder of the evidence before us and does not specifically address the issue of whether she had sufficient capacity to consent, and did in fact, consent.

After weighing all the evidence and having given appropriate deference to the fact that the trial court saw and heard the witnesses, this court is clearly convinced that the findings of guilt were against the weight of the evidence as to Specification 3 of Charge II, and to Charge II. Thus, those findings of guilty are factually insufficient. *See* Article 66(d)(1)(B)(i)–(ii), UCMJ (2024 *MCM*).

### d. False Official Statement

Viewing the evidence in the light most favorable to the Government, the panel members rationally found Appellant guilty of making a false official statement to SMSgt JB, beyond a reasonable doubt. Therefore, the findings of guilty as to Charge III and its Specification are legally sufficient. *See Robinson*, 77 M.J. at 297–98.

Regarding the factual sufficiency of the same conviction, Appellant has made a request for a factual sufficiency review and has asserted a showing of deficiency in that the Government failed to prove he told SMSgt JB he was sexually assaulted. We have considered whether Appellant's claim is specific enough to trigger further analysis. We assume here, without deciding, his claim of deficiency is sufficiently specific for our analysis.

Appellant's first sergeant, SMSgt JB, testified at trial. Two to three days after Appellant received two orders to not contact HC and BH, on a Sunday morning, at about 0800 on 21 February 2021, Appellant called his first sergeant. Appellant said words to the effect of, "I need to get ahead of something." Based upon what SMSgt JB heard Appellant say, SMSgt JB told Appellant that, as a first sergeant, he was a mandatory reporter of sexual assault allegations. SMSgt JB called the installation Sexual Assault Response Coordinator and the OSI on-call agent. Appellant was evaluated by a sexual assault nurse examiner and agreed to a sexual assault forensic examination the same day, 21 February 2021.

Appellant explained that the night before, he had been a designated driver for a group of friends. At the end of the evening, Appellant noticed one of them, JM, crying. He asked her if she wanted to talk, and they went to his room. They talked for a while, and JM said she was tired and wanted to sleep. After the two of them fell asleep in his bed, JM woke up, undressed herself, and "started making sexual advances" which Appellant said made him feel "uncomfortable." He told JM "No," but they had sex.

Here, the Government admitted evidence Appellant initiated a telephone call to his first sergeant and made an oral statement. His first sergeant was a military member carrying out a military duty at the time of Appellant's statement. Appellant averred this encounter with JM was against his consent, which led the first sergeant to articulate he was a mandatory reporter and if this statement was an accurate statement, then he was required to contact the installation sexual assault response coordinator and OSI. Appellant did not try to stop him; instead, Appellant participated in the forensic nurse examination. The statement admitted into evidence that Appellant told his first sergeant he was "trying to get ahead of something" indicated he believed he might be

accused of sexual assault and was intending to deceive his first sergeant that in fact, he was the victim rather than the offender.

After weighing all the evidence and having given appropriate deference to the fact that the trial court saw and heard the witnesses, this court does not conclude that the findings of guilty were against the weight of the evidence to Charge III and its specification. Thus, those findings of guilty are factually sufficient. *See* Article 66(d)(1)(B)(i)–(ii), UCMJ (2024 *MCM*).

### E. Sentence Reassessment

#### 1. Law

Under Article 59(a), UCMJ, 10 U.S.C. § 859(a), a court-martial sentence may not be held incorrect by virtue of legal error "unless the error materially prejudices the substantial rights of the accused." If we can conclude that absent any error, an adjudged sentence would have been at least a certain severity, "then a sentence of that severity or less will be free of the prejudicial effects of error; and the demands of Article 59(a)[, UCMJ,] will be met." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

We have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances, and the following illustrative factors announced in *Winckelmann*: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the [CCAs] should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted).

We may reassess a sentence only if we are able to reliably determine that, absent the error, the "sentence would have been at least of a certain magnitude." *Harris*, 53 M.J. at 88 (citation omitted).

#### 2. Analysis

Having considered the totality of the circumstances, including the *Winckelmann* factors, we are not convinced that we can reliably reassess the sentence. After being found guilty of sexual assault against JM, among the other convictions, Appellant chose to be sentenced by the trial judge, alone. Therefore, we know from the entry of judgment in this case that Appellant was

sentenced to confinement for 54 months for this penetrative sexual assault offense. We also know that this sentence to confinement was to run consecutively with the remaining sentences to confinement, which totaled 100 days (all consecutive). Without the penetrative sexual assault conviction, the dishonorable discharge would not have been mandatory. Therefore, without the penetrative sexual assault conviction, the penalty landscape changes dramatically. The sexual assault of JM was the most serious of all offenses of which Appellant was convicted. While we do have extensive experience and familiarity with the remaining types of offenses, we do not believe we can reliably determine what sentence would have been imposed at trial. Therefore, we believe "the only fair course of action is to have [Appellant] resentenced at the trial level." *Id.* (quoting *United States v. Peoples*, 29 M.J. 426, 429 (C.M.A. 1990)).

### III. CONCLUSION

The findings of guilty as to Specification 2 of Charge I and Charge I, Specification 1 of Charge II and Charge II, and Charge III and its Specification, as entered, are correct in law and fact and **AFFIRMED**. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). The finding of guilty to Specification 3 of Charge II is **SET ASIDE** and that specification is **DISMISSED WITH PREJUDICE**. The sentence is **SET ASIDE**. The case is returned to The Judge Advocate General for remand to an appropriate convening authority who may order a rehearing on the sentence. Article 66(f), UCMJ, 10 U.S.C. § 866(f). Thereafter, the record of trial will be returned to this court for completion of appellate review under Article 66(d), UCMJ, 10 U.S.C. § 866(d).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court